Docket No. 104524.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

MICHELLE WILLIAMS, Indiv. and as Special Adm'r of the Estate of Baby Doe, Deceased, Appellee, v. JOHN C. MANCHESTER, Appellant.

*Opinion filed April 3, 2008.*

JUSTICE FREEMAN delivered the judgment of the court, with opinion.

Chief Justice Thomas and Justices Fitzgerald, Kilbride, Garman, and Karmeier concurred in the judgment and opinion.

Justice Burke took no part in the decision.

## OPINION

This appeal focuses on a wrongful-death claim that plaintiff, Michelle Williams, brought in the circuit court of Cook County against defendant, John Manchester. Plaintiff sought damages for the death of her unborn child, Baby Doe. The circuit court entered summary judgment in favor of defendant on that claim, but a divided panel of the appellate court reversed. 372 Ill. App. 3d 211. We allowed defendant's petition for leave to appeal. 210 Ill. 2d R. 315(a). We now vacate in part the judgment of the appellate court and remand the cause to the circuit court for further proceedings.

# I. BACKGROUND

The record, which includes plaintiff's deposition testimony, contains the following pertinent evidence. In October 2002, plaintiff was 10½ weeks pregnant with Baby Doe, and she had been aware of her pregnancy for approximately one month. Plaintiff had planned to carry Baby Doe to term, and plaintiff and the child's father had been preparing for the birth.

On the night of October 15, 2002, plaintiff was a passenger in an automobile (hereafter, plaintiff's automobile) proceeding east on Montrose Avenue in Chicago. Defendant was driving west on Montrose. As plaintiff's automobile was proceeding through the intersection of Montrose and Western Avenues, defendant turned left, attempting to proceed south on Western Avenue. The two vehicles collided, with the driver's side of defendant's vehicle crashing into that of plaintiff's automobile. According to plaintiff, "[i]t was almost like a head-on" collision. Plaintiff's forehead broke through the windshield. When plaintiff regained consciousness, a firefighter was beside her in the automobile, and he extricated her from the windshield. Plaintiff felt pain not only in her head, but also in her hip.

An ambulance took plaintiff to Advocate Illinois Masonic Medical Center. According to plaintiff, she and Baby Doe's father met with a team of physicians and discussed her condition and treatment options. The physicians informed plaintiff that she did not suffer a spontaneous abortion and that the baby itself was not injured in the collision; rather, "the baby was fine."

However, the physicians informed plaintiff that she, herself, suffered a broken hip and pelvis. As a result, according to plaintiff:

> "[The physicians] told me that because my pelvic bone was broke, they couldn't be certain that I would hold the baby. If I did choose to stay pregnant, I'd have to be bedridden and then the bones would heal themselves and then they might have to go back in and break them again. They couldn't promise that I would ever walk right. Pretty much everything they were saying is, they couldn't promise anything."

Plaintiff further described the meeting as follows:

> "They said that if the bones healed on their own, they might have to go back in and rebreak them to set them again and I'd

-2-

still have to have surgery but it would be afterwards; and they couldn't promise with x-rays and all that that [*sic*] the baby would even be okay."

Dr. Joanne Kirby, plaintiff's emergency room physician, told plaintiff that an X-ray had been taken of her, which, according to plaintiff, "could cause disabilities in the child and mental problems." According to her deposition, plaintiff understood these physicians to share the opinion that it would be best for plaintiff to terminate her pregnancy. Further, when plaintiff ultimately decided to terminate her pregnancy, no physician told her that it was a bad decision or that her decision was not in the best interest of her health. Plaintiff's hospital record indicated: "Patient desires consultation with high-risk OB/fetal specialist."

Dr. James Keller, a high-risk obstetrician-gynecologist, testified in a deposition, relying on several notes in plaintiff's hospital record. At the time of the accident, Dr. Keller was the director of high-risk obstetrics at Illinois Masonic. On October 17 and 18, 2002, he met plaintiff and consulted on her care, but did not actually provide any treatment. He explained that, as a consulting physician, his role was "[t]o make sure that [plaintiff] had as much information as possible, to make sure that the orthopedic surgeon understood the relevant issues, so that they could make a decision as to what the best course of action would be." The counseling that physicians at Illinois Masonic give to patients is "nonjudgmental." Dr. Keller explained that physicians there "just make sure that the patient has the information to make a decision. *** [O]ur overall goal is to be as nonguiding as possible."

In terms of plaintiff specifically, Dr. Keller needed plaintiff to understand the following issues: plaintiff's optimal therapy and the attendant risks of that therapy on the fetus; the best course of treatment for the fetus and the negative effects it would that have on plaintiff; and possible "intermediate scenarios." At the time of Dr. Keller's consultation, plaintiff had a viable pregnancy that could have gone to term. However:

> "To the fetus there's the risk of her [plaintiff's] drug and radiation exposure prior to this point; to the mother there's an increase of prolonged immobilization with a pelvic fracture, which carried short-term and long-term risks. The short-term

-3-

risks would be mainly an increased risk of embolic phenomenon, thrombosis and embolism, blood clots. The long-term risks I would sort of defer to orthopedics, but they said that the longer that she waited to repair the hip the worse her outcome would be."

Thus, Dr. Keller opined that there were "risks involved to the mother and the fetus of continuing the pregnancy."

Regarding Baby Doe's exposure to radiation, Dr. Keller opined:

"With any individual fetus you won't be able to say, well, this is what would happen with this fetus; but in a general term, if you want to know what's the risk, there is no safe threshold for radiation to a fetus, meaning that once she's radiated there is an increased risk of problems related to radiation."

Dr. Keller explained that, generally, radiation exposure may cause organs to develop incorrectly, existing organs to grow and mature incorrectly, and an increased risk of childhood and adult malignancies. Dr. Keller based his opinion on "general medical knowledge" and an unidentified "whole body of literature talking about the damages caused by radiation." He explained that "it's sort of part of the general obstetric literature *** that radiation is a known teratogen or cause of birth defects."

However, Dr. Keller recognized that Baby Doe would not inevitably have had problems because of the radiation to which it was exposed up to the time of his consultation. Also, Dr. Keller could not opine whether Baby Doe would have had problems even with additional radiation exposure throughout the pregnancy. Indeed, Dr. Keller answered in the affirmative the question: "There is no way with absolute certainty to conclude what the ultimate effects of radiation exposure is to a fetus?" Dr. Keller actually "had plenty of patients who have had exposure to radiation who have delivered perfectly healthy babies." Dr. Keller would defer to radiology specialists as to quantifying the amount of radiation to which Baby Doe was exposed and the corresponding risk. Dr. Keller did not consider himself an expert in medical radiation exposure so as to render an opinion in this case. Although he stated that he could so qualify himself through personal research and consultation with radiology specialists, he did not plan to do so in this case.

Dr. Keller read his consultation notes into the deposition record. When he first met plaintiff, he discussed plaintiff's case only generally. He needed to know the impact of continuing the pregnancy on her orthopedic treatment and what the alteration of such treatment to benefit the fetus would mean to plaintiff's long-term outcome. His notes indicated: "Patient would like to continue pregnancy but not at risk to her long-term outcome." Dr. Keller's notes indicated that he would speak with plaintiff's orthopedist "to get better idea of drug/radiation exposure, risk of waiting, and then revisit with patient."

Dr. Keller also read into the record a note from plaintiff's orthopedist, Dr. David Beigler, which stated: "If child is desired, then nonoperative care is recommended." However, the note continued: "If the fetus is not wanted," termination of pregnancy "is suggested such that ORIF or open reduction, internal fixation could be performed. Similarly, if spontaneous abortion occurs, ORIF may be contemplated."[1] Remembering his conversation with Dr. Beigler, Dr. Keller testified: "it seems the gist of the conversation was that the longer we waited the worse the long-term outcome for the mother is going to be."

After consulting with plaintiff's orthopedist, Dr. Keller had a second meeting with plaintiff. Baby Doe's father was also present. Dr. Keller discerned four options: (1) immediate pelvis surgery without termination of pregnancy; (2) immediate termination of pregnancy and, postrecovery, pelvis surgery; (3) delayed pelvis surgery until second trimester of pregnancy; and (4) delayed pelvis surgery until plaintiff gave birth. The first option put the fetus at risk for loss as a result of the pelvis surgery itself, "as well as long-term problems due to radiation/medicine which would be difficult to quantify." The third option would decrease the risk to the fetus of drug and radiation exposure. However, the second option offered plaintiff the "best chance" for a "good long-term outcome."

---

[1] "Open reduction" refers to cutting through soft tissue until a dislocated bone can be reached and manipulated. 4 J. Schmidt, Attorneys' Dictionary of Medicine O–57 (2007). "Internal fixation" refers to fastening together a fractured bone by such means as metal plates or screws, applied directly to the bone. 3 J. Schmidt, Attorneys' Dictionary of Medicine I–142 (2007).

Essentially, the longer plaintiff delayed pelvis surgery, the worse her long-term outcome would have been.

Dr. Keller's notes indicated: "Long discussion with patient and father of the baby. They understand all issues. I will put through PEC papers." Dr. Keller explained that "PEC" referred to the hospital's perinatal ethics committee. The health-care system of which Illinois Masonic is a member has a policy not to terminate a pregnancy unless, as Dr. Keller paraphrased, there is a significant risk to the mother or the fetus. His last note, dated October 18, 2002, stated: "Patient opts for termination of pregnancy. Paperwork forwarded. Awaiting PEC results. Risk of D & C[2] discussed." Dr. Keller had no subsequent contact with plaintiff.

According to plaintiff's deposition, the pregnancy was terminated within one week after the accident. The pelvis surgery was performed approximately two weeks subsequent to the accident.

Plaintiff timely filed a three-count complaint in the circuit court, alleging that defendant's negligence proximately caused the automobile collision. In addition to seeking damages for her own injuries, plaintiff, as administrator of the estate of Baby Doe, brought an action pursuant to the Wrongful Death Act (740 ILCS 180/1 (West 2002)). Plaintiff alleged that she was pregnant with Baby Doe, and that defendant's negligence proximately caused the collision, "ultimately causing" Baby Doe's death. Plaintiff sought damages for injuries to herself and Baby Doe's father as next of kin. In her third claim, plaintiff sought damages for defendant's alleged negligent infliction of emotional distress. Defendant filed an answer denying all material allegations.[3]

---

[2] "The abbreviation for *dilatation* and *curettage*, an operation in which the cervix of the uterus is dilated by means of an instrument and the interior of the uterus is then scraped out (curetted) by means of a curet (scraping instrument)." 2 J. Schmidt, Attorneys' Dictionary of Medicine D–1 (2007).

[3] Defendant also filed a third-party complaint against Michelle Popec, who was the driver of the automobile in which plaintiff was a passenger. Defendant alleged that Popec's negligent driving caused the accident. Popec filed an answer denying all material allegations.

Discovery adduced the above-recited evidence. Defendant moved for summary judgment on plaintiff's claims for wrongful death and negligent infliction of emotional distress. Regarding the wrongful-death claim, defendant argued that the accident, X-ray, or any other potential risk to the fetus was not the proximate cause of the fetus' death. Rather, Baby Doe's death was the result of plaintiff's voluntary decision to terminate the pregnancy. Plaintiff voluntarily chose to terminate the pregnancy so that she could proceed with the pelvis surgery, "despite being provided options that would have allowed her to postpone surgery and forego termination of the pregnancy."

In response, plaintiff contended that defendant's negligence was the "cause in fact" of Baby Doe's wrongful death because "but for the defendant's negligence the termination [of the pregnancy] would not have occurred." Plaintiff further contended that defendant's negligence was the proximate cause of Baby Doe's death because plaintiff's decision to terminate the pregnancy "was a foreseeable result of the defendant's negligence." Both defendant and plaintiff relied on the depositions of plaintiff and Dr. Keller to support their respective positions.

The circuit court entered summary judgment in favor of defendant on the wrongful-death claim.

> "The Court finds that based on the express language of the Wrongful Death Act, Plaintiff cannot maintain a cause of action on behalf of her fetus. In establishing proximate cause, the Act does not take into consideration the reasonable foreseeability of an injury or death, but, rather, focuses primarily on whether a defendant's conduct actually caused the injury or death. Here, the evidence establishes that, subsequent to the car accident, Plaintiff's fetus was uninjured and viable. Thus, Plaintiff could have continued with the pregnancy. However, rather than continue with the pregnancy and wait until later to address her own injuries, Plaintiff chose to receive medical treatment at the sacrifice of her fetus, thereby, terminating her pregnancy."

The circuit court concluded that plaintiff's termination of her pregnancy was the actual cause of Baby Doe's death, and defendant's

alleged negligence did not cause any injury or death to Baby Doe, as required by the Wrongful Death Act.[4]

We observe that plaintiff shortly thereafter added a survival claim (count IV), in which plaintiff, as administrator of Baby Doe's estate, sought damages for injuries to Baby Doe, "including radiation and medication exposure," as a result of defendant's negligence. Defendant moved for summary judgment. In her response, plaintiff not only relied on Dr. Keller's testimony, but also attached an affidavit by Dr. Mark Edelman, a board-certified radiologist. Having reviewed plaintiff's hospital record, Dr. Edelman stated that plaintiff received a CAT scan and pelvic X-rays and, consequently, was exposed to radiation. "Based on a reasonable degree of radiological certainty," Dr. Edelman opined that Baby Doe's radiation exposure "prior to the pregnancy termination *** produced an increased risk of future injury to the fetus, specifically neural tube deformity." Dr. Edelman opined that "the fetus was damaged in that it sustained with a reasonable degree of radiological certainty an increased risk of future neural tube deformity."

The circuit court granted defendant's motion for summary judgment on this claim. The court found, *inter alia*, that the record did not contain any "quantifiable evidence that the fetus was actually damaged from the radiation exposure. *** Evidence that the fetus *may have* been at risk for future deformities is purely speculative. A risk of injury does not equate to an actual injury." (Emphasis in original.)

The circuit court found that these summary judgment orders were final and that there was no just reason to delay enforcement or appeal pursuant to Supreme Court Rule 304(a) (210 Ill. 2d R. 304(a)).

---

[4] However, the circuit court denied defendant's motion for summary judgment on plaintiff's claim of negligent infliction of emotional distress. According to the court, a jury could find that: (1) "it was reasonably foreseeable to expect that a pregnant woman who is injured in a motor vehicle accident would be forced to put her fetus at risk in order to have her own injuries treated"; and (2) "forcing an expectant mother to choose between treating her own injuries and saving the life of her fetus, a decision she would otherwise not be forced to make but for the defendant's negligence, is a severe and serious emotional injury."

A divided panel of the appellate court reversed the summary judgment in favor of defendant on plaintiff's wrongful-death claim. 372 Ill. App. 3d 211. The appellate court began its analysis of that claim by observing that "[a]side from the additional element of the occurrence of death, the elements of a wrongful death claim are identical to those of a common law negligence claim." 372 Ill. App. 3d at 223. According to the appellate court, the dispositive issue in the appeal was "grounded in established tort principles surrounding proximate cause." 372 Ill. App. 3d at 223. The court concluded: "[W]e cannot agree that, as a matter of law, it would be unforeseeable that a pregnant woman, injured through a person's negligence, would agree to endure the medical consequences to herself, or the fetus for that matter, regardless of their severity, simply for the sake of maintaining the pregnancy." 372 Ill. App. 3d at 234. The court held: "Given the risks and alternatives communicated to her [plaintiff] by her physicians, and the legality and availability of the choice she made, the foreseeability of that choice must be determined by a jury and not by a judge as a matter of law." 372 Ill. App. 3d at 246-47.

We observe that the appellate court affirmed the summary judgment in favor of defendant on the survival count. The court found that, even if the increased risk of future harm can legally constitute a present injury, plaintiff "did not make below and does not presently make any attempt to show what *antemortem* damages Doe may have incurred therefrom." 372 Ill. App. 3d at 248. Recognizing that a valid cause of action must generally include both injury and damages, the appellate court concluded: "Thus, by declining to even address Baby Doe's *antemortem* damages, [plaintiff] has given us no basis on which to find error in the circuit court's order granting summary judgment on her survival count." 372 Ill. App. 3d at 248.

Justice Cahill dissented from both the reasoning and result of the court on the wrongful-death claim. He disagreed that the controlling analysis should be grounded in general tort principles surrounding proximate cause. Rather, he opined that the court "must decide, as a matter of law, whether the language of the Wrongful Death Act permits a cause of action based on the facts of this case." 372 Ill. App. 3d at 249 (Cahill, J., dissenting). Accepting that Baby Doe was a "person" within the meaning of the Wrongful Death Act, Justice Cahill reasoned that "there can be no cause of action for wrongful

death. Had the fetus not been aborted, there is no way of knowing under the facts of this case whether the fetus had suffered an actionable injury before death." 372 Ill. App. 3d at 249-50 (Cahill, J., dissenting).

## II. ANALYSIS

This matter is before us on the appellate court's reversal of the grant of summary judgment in favor of defendant on plaintiff's wrongful-death claim. The purpose of summary judgment is not to try a question of fact, but rather to determine whether a genuine issue of material fact exists. *Bagent v. Blessing Care Corp.*, 224 Ill. 2d 154, 162 (2007); *Gilbert v. Sycamore Municipal Hospital*, 156 Ill. 2d 511, 517 (1993). Summary judgment is appropriate only where "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2–1005(c) (West 2002).

In determining whether a genuine issue as to any material fact exists, a court must construe the pleadings, depositions, admissions, and affidavits strictly against the movant and liberally in favor of the opponent. A triable issue precluding summary judgment exists where the material facts are disputed or where, the material facts being undisputed, reasonable persons might draw different inferences from the undisputed facts. Although summary judgment can aid in the expeditious disposition of a lawsuit, it remains a drastic means of disposing of litigation and, therefore, should be allowed only where the right of the moving party is clear and free from doubt. *Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32, 43 (2004) (and cases cited therein). If the plaintiff fails to establish any element of the cause of action, summary judgment for the defendant is proper. *Bagent*, 224 Ill. 2d at 163; *Dardeen v. Kuehling*, 213 Ill. 2d 329, 335 (2004). In appeals from summary judgment rulings, review is *de novo*. *Bagent*, 224 Ill. 2d at 163; *Roth v. Opiela*, 211 Ill. 2d 536, 542 (2004).

### A. Controlling Principles

Plaintiff brings her wrongful-death claim pursuant to the Wrongful Death Act (740 ILCS 180/0.01 (West 2002)). Even when

prompted by the dissent, the appellate court majority failed to apprehend the statutory nature of a wrongful-death action. The conflicting analyses of the appellate court in this case, and the arguments of counsel before this court, indicate that a thorough discussion of the Wrongful Death Act is necessary.

At common law, a cause of action died concurrently with the death of the injured party, and there was no right of recovery after the injured person's death. *Howlett v. Doglio*, 402 Ill. 311, 319 (1949). Also at common law, there was no cause of action to recover damages for the death of another by wrongful act, negligence, or default. *Biddy v. Blue Bird Air Service*, 374 Ill. 506, 513 (1940); see generally W. Keeton, Prosser & Keeton on Torts §125A, at 940 (5th ed. 1984) ("If the tortfeasor caused a victim's death, relatives and dependents of the victim who were deprived of financial support or who suffered emotional loss, had no cause of action of their own"). Therefore, at common law: "The result was that it was cheaper for the defendant to kill the plaintiff than to injure him, and that the most grievous of all injuries left the bereaved family of the victim, who frequently were destitute, without a remedy." W. Keeton, Prosser & Keeton on Torts §127, at 945 (5th ed. 1984).

In 1853, the Illinois General Assembly enacted the Injuries Act (1853 Ill. Laws 97), now known as the Wrongful Death Act (740 ILCS 180/0.01 *et seq.* (West 2002)).[5] Section 1 of our Wrongful Death Act currently reads exactly as it did when first enacted 155 years ago:

> "Whenever the death of a person shall be caused by wrongful act, neglect or default, and the act, neglect or default is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages in respect thereof, then and in every such case the person who or

_____

[5] In 1846, the British Parliament enacted what is familiarly known as Lord Campbell's Act, which served as the model for most state wrongful death statutes. W. Keeton, Prosser & Keeton on Torts §127, at 945-46 (5th ed. 1984). The Illinois Wrongful Death Act is substantially a copy of Lord Campbell's Act. *Hall v. Gillins*, 13 Ill. 2d 26, 29 (1958); *Nudd v. Matsoukas*, 7 Ill. 2d 608, 612 (1956); 740 ILCS Ann. 180/0.01, Historical & Statutory Notes, at 158 (Smith-Hurd 2002).

company or corporation which would have been liable if death had not ensued, shall be liable to an action for damages, notwithstanding the death of the person injured, and although the death shall have been caused under such circumstances as amount in law to felony." 740 ILCS 180/1 (West 2002).

In subsequent sections, the Act specifies in whose name and for whose benefit the action shall be brought. It also establishes the time limit in which the suit shall be commenced, the maximum amount that can be recovered, and the manner in which proceeds are distributed. 740 ILCS 180/2 *et seq.* (West 2002).

The primary rule of statutory construction is to ascertain and give effect to the intent of the legislature. We look to the language of the statute itself as the best indication of legislative intent. *Kirwan v. Welch*, 133 Ill. 2d 163, 165 (1989); *Metropolitan Life Insurance Co. v. Washburn*, 112 Ill. 2d 486, 492 (1986). Further, a statute in derogation of the common law cannot be construed as changing the common law beyond what the statutory language expresses or is necessarily implied from what is expressed. In construing such a statute, a court will not presume that the legislature intended an innovation of the common law further than that which the statutory language specifies or clearly implies. *Russell v. Klein*, 58 Ill. 2d 220, 225 (1974), citing *Walter v. Northern Insurance Co. of New York*, 370 Ill. 283, 288-89 (1938). Indeed, "statutes in derogation of common law are to be strictly construed and nothing is to be read into such statutes by intendment or implication." *Summers v. Summers*, 40 Ill. 2d 338, 342 (1968).

In accord with these principles, this court has consistently expressed its understanding of the Wrongful Death Act. Only four years subsequent to its enactment, this court first construed the new Injuries Act, observing that the statute created a new cause of action "unknown to the common law, and should not be extended beyond the fair import of the language used." *City of Chicago v. Major*, 18 Ill. 349, 356 (1857). This understanding of the Act continues to the present day:

"The Wrongful Death Act permits a recovery for the death of an individual by wrongful act, neglect, or default, where none existed at common law. *** [T]he Act is viewed, traditionally, as creating the cause of action, which must be

brought in the name of the representative, for the pecuniary losses which a surviving spouse and next of kin may have sustained by reason of the death of the injured person." *Pasquale v. Speed Products Engineering*, 166 Ill. 2d 337, 360 (1995) (collecting cases).

The Act alone is the source of the right to sue. The legislature, having conferred a cause of action for wrongful death, has determined who shall sue and the conditions under which the suit may be brought. *Wilson v. Tromly*, 404 Ill. 307, 310 (1949); accord *Hall*, 13 Ill. 2d at 29 (observing that the legislature "created both the right and the remedy"). Because this is a statutory action, where the right is conditional, the plaintiff must bring the case clearly within the prescribed requirements necessary to confer the right of action. *Hartray v. Chicago Rys. Co.*, 290 Ill. 85, 86-87 (1919). Also, this court has repeatedly held that the Act " 'should be strictly construed.' " *Pasquale*, 166 Ill. 2d at 360, quoting *Wilson*, 404 Ill. at 310; *Kessinger v. Grefco, Inc.*, 251 Ill. App. 3d 980, 983 (1993) (same). This appeal turns on one such statutory requirement.

An injury resulting from the wrongful act, neglect, or default of another gives the victim, if she survives the injury, a right of action; if the victim dies, the Act transfers the right of action to the victim's personal representative. "In either case the cause of action is the same." *Crane v. Chicago & Western Indiana R.R. Co.*, 233 Ill. 259, 262 (1908). Based on the plain language of section 1:

> "[O]ur cases have consistently interpreted the Wrongful Death Act to require, as a condition for maintaining a wrongful death action, that the decedent have been able to bring, at the time of his death, an action for damages resulting from the occurrence. Thus, in a variety of contexts, our court has referred to the rule that a wrongful death action is barred if the decedent, at the time of death, would not have been able to pursue an action for personal injuries. [Citations.] In this sense an action under the Wrongful Death Act may be said to be derivative of the decedent's rights, for the ability to bring the wrongful death action 'depends upon the condition that the deceased, at the time of his death, had he continued to live, would have had a right of action against the same person or persons for the injuries sustained.' *Biddy*, 374 Ill. at 513-

14." *Varelis v. Northwestern Memorial Hospital*, 167 Ill. 2d 449, 454-55 (1995).

If the decedent had no right of action at the time of his or her death, the personal representative has none under the Wrongful Death Act. Thus, the "injury" that the personal representative alleges caused the decedent's death must be the same "injury" that the decedent suffered prior to his or her death. *Biddy*, 374 Ill. at 514; *Crane*, 233 Ill. at 262. Further: "In disallowing wrongful death actions when the decedent could not have maintained a claim for personal injuries at the time of death, the Act attaches no significance to the particular reason why the decedent's claim would have been barred." *Varelis*, 167 Ill. 2d at 460.

In the present case, the appellate court did not recognize this requirement of section 1 of the Wrongful Death Act; indeed, the court failed to cite to even one of the many decisions of this court so holding, only some of which we cited above. The appellate court began its analysis of the Wrongful Death Act by observing: "Aside from the additional element of the occurrence of death, the elements of a wrongful death claim are identical to those of a common law negligence claim." 372 Ill. App. 3d at 223. Responding to the dissent, the court further observed that "the standards surrounding proximate causation in ordinary negligence cases have always applied in wrongful death cases, including the standards surrounding multiple and intervening causes." 372 Ill. App. 3d at 245.

These observations are correct–when viewed in isolation. As earlier stated, based on the plain language of section 1 of the Act, the representative's wrongful-death action is derived from the decedent's cause of action and is limited to what the decedent's cause of action against the defendant would have been had the decedent lived. "Obviously, this provision of the statute prevents automatic recovery for every death. It incorporates into the statutory right of action the familiar concepts of tort liability,–negligence, contributory negligence, and the like." *Welch v. Davis*, 410 Ill. 130, 132 (1951). However: "Because the action is viewed as a creature of statute, its conditions of liability proscribe the right of action itself and not merely the remedy alone." *Pasquale*, 166 Ill. 2d at 361. The statutory requirement of an injury to the decedent is a mandatory prerequisite to confer the right of action on the representative. In other words,

-14-

general tort principles shape the decedent's and, derivatively, the representative's remedy in the form of a cause of action. However, the statutory requirement of an injury to decedent confers the right of action in the first place. See *Hartray*, 290 Ill. at 86-87; *Crane*, 233 Ill. at 262. We next consider what was–and was not–the actionable injury in this case.

### B. Baby Doe's "Injury" Pursuant to Wrongful Death Act

The appellate court misapprehended the injury in this case for which the Wrongful Death Act provides a right of action. The court framed its analysis as follows:

> "The parties concur that the primary issue in the case before us is grounded in established tort principles surrounding proximate cause. Specifically, the parties agree that the primary issue presented in this case is whether a party's negligence causing injury to a pregnant woman may make it foreseeable that she will decide to undergo an abortion to facilitate her own medical treatment, so that the original tortfeasor will be the proximate cause *of the fetus' death*, or if the woman's decision to abort becomes a superceding cause *of the fetus' death* thereby relieving the original tortfeasor of liability *for the fetus' death*." (Emphases added.) 372 Ill. App. 3d at 223.

Thus, the court expressly identified the "injury" in plaintiff's wrongful-death claim as Baby Doe's death.

The appellate court's statement of the issue and ensuing proximate cause analysis ignores the plain language of section 1 of the Wrongful Death Act as consistently interpreted by this court. As the appellate court dissent correctly recognized:

> "The majority's proximate cause analysis and conclusion that the negligence of [defendant] can be causally linked to the abortion extends the reach of the wrongful death statute beyond its plain language. Put another way, the proximate cause analysis of the majority relies on a theory that the 'death' of the fetus is the 'injury' that supports the wrongful death cause of action. The analysis, I respectfully submit, writes out of the Wrongful Death Act the requirement that

there must have been an actionable injury to the fetus with recoverable damages that could have been maintained had death not intervened." 372 Ill. App. 3d at 250-51 (Cahill, J., dissenting).

We agree.

Although the appellate court viewed the dissent's position as a "novel 'direct injury' theory" (372 Ill. App. 3d at 244), it is clear from our discussion of the Wrongful Death Act that the dissent was simply applying the Act to the evidence in this case. Of course, on a certain level, any death, by itself, creates a loss to the decedent's next of kin. However, a wrongful-death action is premised on the deceased's potential, at the time of death, to bring an action for injury. *Varelis*, 167 Ill. 2d at 457-58, quoting *Wyness v. Armstrong World Industries, Inc.*, 131 Ill. 2d 403, 411 (1989). In the present case, it was "not until the death occurred could the court examine whether there was a viable wrongful injury which would permit the case to proceed." *Wyness*, 131 Ill. 2d at 415. Having determined that Baby Doe's death itself is *not* the actionable injury in this case, this court's long-standing construction of section 1 of the Act "refers us at once to the inquiry, whether an action could have been maintained by the child, for the injury, had he survived it." *Major*, 18 Ill. at 356.

The evidence of record discloses that Baby Doe could not have maintained a claim for personal injury against defendant based on the automobile collision itself. Initially, plaintiff's physicians told plaintiff that Baby Doe was not injured in the collision. Further, Dr. Keller testified positively and unequivocally that Baby Doe did not suffer any injury as a result of the accident itself. According to Dr. Keller, plaintiff had a viable pregnancy that could have gone to term. Indeed, in her brief before this court, plaintiff contends that she "has never claimed that BABY DOE received injuries in the actual crash but rather that they occurred in the hospital following the crash."

In her brief, plaintiff first points to various statements in the record in support of her contention that "had the fetus survived it could have maintained an action against the Defendant for radiation and medication exposure occurring in utero which was caused by the Defendant's negligence." Significantly, however, at oral argument, plaintiff expressly conceded that, for purposes of summary judgment, the record did not contain sufficient evidence that Baby Doe suffered

a present, actionable injury as a result of the radiation exposure. Drs. Keller and Edelman did not opine that Baby Doe's radiation exposure resulted in an actual, present injury, but rather that the fetus incurred an increased risk of future harm.

Plaintiff's concession leaves us with her remaining contention. Relying on *Dillon v. Evanston Hospital*, 199 Ill. 2d 483 (2002), plaintiff posits, as a matter of law, that Baby Doe's radiation exposure is an increased risk of future harm and that "an increased risk of future harm is a present injury" for which the fetus could have brought an action for damages against defendant. This contention lacks merit for two reasons.

First, as a matter of law, an increased risk of future harm is an *element of damages* that can be recovered for a present injury–it is *not* the injury itself. In *Dillon*, the plaintiff brought a medical malpractice action arising from a broken catheter. Defendant physician inserted a 16-centimeter catheter into a vein under the plaintiff's clavicle. The physician subsequently removed the catheter. However, unbeknownst to the plaintiff or the physician, a nine-centimeter fragment of the catheter broke off and remained in the plaintiff. The fragment migrated to the plaintiff's heart. The tip of the fragment became embedded in a wall of a chamber of the plaintiff's heart, with the rest of the fragment floating therein. Defendants opined that it would be more dangerous to attempt to remove the fragment than to leave it in place. *Dillon*, 199 Ill. 2d at 487-88. The present injury was the catheter embedded in the plaintiff's heart. At issue in *Dillon* was the availability and computation of damages for the increased risk of future harm from the plaintiff's present injury. *Dillon*, 199 Ill. 2d at 496-507. This court held that for a plaintiff to recover damages for an increased risk of future harm in a tort action, the plaintiff must establish, *inter alia*, that the defendant's breach of duty caused a present injury that resulted in the increased risk of future harm. *Dillon*, 199 Ill. 2d at 506, citing Connecticut Civil Jury Instruction No. 2–40(c). However, "the issue we deal with today is not the scope of damages in a wrongful death action, but rather who may sue and under what conditions." *Forthenberry v. Franciscan Sisters Health Care Corp.*, 156 Ill. App. 3d 634, 636 (1987) (applying Wrongful Death Act).

Second, even if we were to convert or expand *Dillon* so as to describe an increased risk of future harm as a present injury, plaintiff, as a matter of fact, has not presented any evidence that Baby Doe was injured as a result of the increased risk. In the context of Baby Doe's survival claim, the appellate court found that plaintiff failed to present any evidence of damages. 372 Ill. App. 3d at 248; see *Wyness*, 131 Ill. 2d at 410 (observing that a "survival action allows for recovery of damages for injury sustained by the deceased up to the time of death"). As the appellate correctly observed, there can be no legal injury without damages. 372 Ill. App. 3d at 248; see *Zapf v. Makridakis*, 46 Ill. App. 3d 764, 766 (1977) (observing that proof of damages "is essential for recovery in a suit for negligence"); *Kerbeck v. Suchy*, 132 Ill. App. 2d 367, 370 (1971) (same); *Franks v. North Shore Farms, Inc.*, 115 Ill. App. 2d 57, 65 (1969) ("An action cannot be maintained for an injury without damage").

In summary, a wrongful-death action is a statutory, independent cause of action that does not arise until after death. However, the action is derivative of the injury to the decedent and is grounded on the same wrongful act of defendant, whether it was prosecuted by the injured party during his lifetime or by a representative of the estate. The representative's right of action depends upon the existence, in the decedent, at the time of his or her death, of a right of action to recover for such injury. *Varelis*, 167 Ill. 2d at 454-55; *Crane*, 233 Ill. at 262; see *Kessinger*, 251 Ill. App. 3d at 987-88. Further, it is the representative's burden to bring the case within the prescribed requirements in order to confer the right of action. *Hartray*, 290 Ill. at 86-87.

In the present case, the record does not establish the threshold requirement under the Wrongful Death Act that Baby Doe, prior to death, had a present injury such that the fetus could have maintained a cause of action against defendant. Any complaint regarding this statutory prerequisite must be taken to the legislature. Plaintiff's sole contention is that Baby Doe suffered an increased risk of future harm from radiation exposure. As a matter of law, such circumstances are not actionable under the Wrongful Death Act and, even if they were, this record is factually insufficient. Accordingly, plaintiff's wrongful-death claim fails and the circuit properly entered summary judgment in favor of defendant.

### III. CONCLUSION

For the foregoing reasons, we uphold the circuit court's entry of summary judgment in favor of defendant on plaintiff's wrongful-death claim. Accordingly, that part of the judgment of the appellate court, which reversed the summary judgment, is vacated, the judgment of the circuit court of Cook County is affirmed, and the cause is remanded to the circuit court for further proceedings.

*Appellate court judgment vacated in part;*
*circuit court judgment affirmed;*
*cause remanded.*

JUSTICE BURKE took no part in the consideration or decision of this case.