CHARLES GASTON, JR., as Special Adm'r of the Estate of Charles Christopher Gaston, Deceased, Plaintiff-Appellant, v. THE CITY OF DANVILLE, Defendant-Appellee (McClintock Civil Engineering Service *et al.*, Defendants).

Fourth District No. 4—08—0803

Opinion filed July 17, 2009.

STEIGMANN, J., specially concurring.

Dennis J. Decaro (argued), of Law Offices of Kupets & DeCaro, P.C., of Chicago, for appellant.

592

John F. Martin (argued), of Meachum & Martin, of Danville, for appellee.

JUSTICE TURNER delivered the opinion of the court:

On April 4, 2006, decedent, Charles Christopher Gaston, age 17, was killed while descending a public parking garage stairwell when a stair stringer collapsed and, as a consequence, a staircase fell on him from above. On April 11, 2006, plaintiff, decedent's father Charles Gaston, Jr., filed a complaint alleging negligence and willful and wanton misconduct against defendant, the City of Danville (hereafter city). In October 2006, plaintiff amended his complaint to add McClintock Civil Engineering Service (hereafter McClintock) and Schomburg and Schomburg Construction General Contractors, Inc. (hereafter Schomburg), as defendants. In September 2008, the trial court granted defendants' motions for summary judgment. In October 2008, plaintiff settled with McClintock and Schomburg and dismissed the counts against them with prejudice. Plaintiff appeals the grant of summary judgment in the city's favor. In granting summary judgment, the court held that the city owed no duty of care to decedent under the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act) (745 ILCS 10/1—101 through 10—210 (West 2006)) because he was not an intended user of the parking garage. Plaintiff appeals, arguing (1) the trial court erred in concluding decedent was not an intended user of the stairwell and (2) the city had a mandatory duty to inspect its property and maintain it in a safe condition. We reverse and remand with directions.

## I. BACKGROUND

### A. The Parking Garage

The parking garage where the accident occurred is located at 22 North Walnut Street in Danville, Illinois. The garage is four stories tall with parking on each level. The roof is an open-air parking deck, which provides views of downtown Danville and the surrounding area. The garage has two stairwells, one each at the north and south end. The stair stringer that collapsed and permitted the staircase sections to fall was located in the north stairwell and connected the landings at parking levels 3 and 2.5.

The garage is open 24 hours per day, but parking is not permitted from 2 a.m. to 6 a.m. Any member of the public may rent a parking space in the lot for $2 per day or around $16 per month. Monthly renters may park from 6 a.m. to 6 p.m. in any space in the garage seven days per week. Public restrooms are located within the garage as well.

The city's Motor Vehicle Parking System (MVPS) office is located in the garage on the first floor. The office houses the two MVPS employees, Dawne Chapman and Larry Coffey, who are responsible for all public parking in Danville. The public may use the office to fill out and drop off monthly permit applications, pick up monthly parking passkeys, pay parking tickets, and lodge complaints.

The garage has also housed public events at various times. Each summer the Downtown Danville Association hosts the Crow Fest in the garage, and in the summer of 2003, two music concerts were held there. On New Year's Eve 2004 and 2005, the garage was the site of the First Night party.

Dawne Chapman, MVPS superintendent, had responsibility for managing and maintaining the garage. Chapman gave an evidentiary deposition, in which she admitted that children and teenagers frequently played in the garage, especially on the rooftop parking deck and the ramps. In response, at some unspecified time prior to the stair-stringer collapse, Chapman asserted she had placed signs stating, "[n]o [t]respassing, [p]atron [p]arking [o]nly" around the garage, including at its automobile entrances.

The Danville Code of Ordinances (hereafter Danville Code) makes the garage a public place. Regarding parking lots owned by the City of Danville, the Danville Code states the following:

> "For the purpose of preserving public peace, health, and safety, the entire premises occupied by a [city] parking lot, together with means of ingress thereto and egress therefrom, are declared to be a public place." Danville Code of Ordinances §114.01(B) (adopted August 1, 1995).

### B. The Condition of the Stairwell From 2001 to 2006

As early as 2001, the city had knowledge that the stairwell had structural problems. In late September or early October 2001, Coffey, MVPS maintenance worker, alerted city officials to problems with the north stairwell. Coffey testified that he was walking down the stairway at level 2 when the staircase connecting levels 2 and 2.5 broke loose from the stair stringers at the landing on level 2. Coffey jumped out of the stairwell, which the city immediately closed for repairs. Upon inspecting the stairwell, an engineer employed by the city, Joe Gleisner, determined that a proper inspection would require a structural engineer. The city then contacted McClintock, a licensed structural engineer. McClintock examined the stairwell and on September 25, 2001, provided the city a written report of his findings.

In a section entitled "assessment of existing conditions," the report states, in pertinent part, that "[t]he stairway is beginning to fail." Regarding the level 2 landing, McClintock's report concluded the following:

"The stairway leading up from [l]anding #2 has no connection at its base. Consequently[,] it is very springy and would be prone to collapse under occupant load.

The reason for this condition is that the welds which once supported the stairs are broken due to an accumulation of '[pack] [r]ust.' "

McClintock report further notes the existence of pack rust at the landing on level 3. The report recommends chiseling or picking rust from between the landing's metal parts and then either "jacking across to the other side" before welding the gap shut or adding "shim plates between parts then welding shut." Both plans called for reinforcing the connection between the stair stringer at level 3 and the landing itself.

After receiving McClintock's recommendations, the city contacted Schomburg for a cost estimate. Schomburg engineer Dave Walter visited the stairwell and read McClintock's report before providing written recommendations in two letters. The first letter, dated October 11, 2001, provides a basic assessment of the stairwell's condition and two repair options. Option one entailed repairing and replacing the second-floor landing only, which Schomburg estimated would cost $6,500. Option two entailed replacing the entire stairwell, which Schomburg estimated would cost $30,000. Regarding the stairwell itself, the letter states the following:

"[T]he steel and concrete stairs are in poor condition, particularly at the second floor landing where the connection to the stair stringers has completely failed. ***

*** We [(Schomburg)] also noted section loss in several stair stringers in other locations so severe that the channel webs have holes. Pack rust between the landing frames and carrier angles has broken welds in a number of locations."

Walter stated in his deposition that "section loss" describes the thinning and weakening of metal due to pack rust. While detailing a plan to fix the existing landing only, which both McClintock and Schomburg stated was the bare minimum required to put the stairs back into service, the letter continues:

"The biggest disadvantage of [fixing only the second-floor landing] is that it may not be the most economical solution in the long run. Because the deterioration of the connections to the other stair landings cannot be determined, the *useful life of the rest of the stairway is unknown*. The corrosion that has already taken place will continue, even if the stairs are cosmetically improved with paint." (Emphasis added.)

The letter of October 15, 2001, also included two more repair plans suggested by McClintock. Option three proposed repairing and

replacing the second-floor landing, including scraping off rust and repainting around the landing, with an estimated cost of $7,000. Option four proposed the same repairs as option three with the following additions:

"Cut out and replace the bottom of the stair stringer at the first level. Add checkerplate treads and risers over the existing concrete steps and weld to the existing stair stringers. Wire brush the metal support angles ***. At the landings at levels [2.5, 3, 3.5, and 4], wire brush rusty areas. Add steel shim plates below the existing pan support angles [(joints supporting the stairs themselves from below)] and weld to the [stair stringers]."

It appears from Chapman's deposition former Mayor Robert Jones and former MVPS director Ron Neufeld worked in concert to authorize repairs. They ultimately chose option three. In November 2001, Schomburg completed the repairs to level 2. According to Walter's deposition, the city never asked Schomburg to return to the garage to inspect the stairwell or make additional repairs.

According to Chapman's deposition testimony, the city did not have an inspection policy and the stairwell underwent no further repair work before the April 2006 collapse. The record also fails to disclose any written inspection policy or any stairwell inspections, whether informal or pursuant to city policy, between November 2001 and the April 2006 collapse. In Walter's opinion as an engineer, the stairwell "should have been inspected frequently."

For background purposes only and without accepting the report as incontrovertible fact, we excerpt the report of plaintiff's expert, doctor of civil engineering German Gurfinkel, which describes the April 2006 collapse as follows:

"After the 2001 separation, McClintock, Walter, and the City of Danville all knew or should have known that the entire staircase was most likely compromised and it was luck that had prevented the collapse of stair branch No. 3 in 2001. Further, that it was likely that failure would occur at another joint under load, and if that occurred, it would more likely be that the entire stair branch would collapse as occurred actually on April 4, 2006.

About five years elapsed between the first and second incidents during which continuous corrosion of the steel structure progressed. The second incident took place on [April 4, 2006,] as [decedent] was going down stair branch No. 4 (between landings 3 and 2.5) on his way out of the building. Structural analysis and review of the evidence leads me to believe that the accident started when the welded connections of the stair stringers to landing 2.5 fractured. Fracture 2.5-SE *** originated first and was immediately followed by fracture 2.5-S. At that instant[,] the stair lost its continuity and

became a cantilever as described above for the first accident in 2001. This resulted in a sudden downward deformation of the stairs that must have made [decedent] lose his balance and tumble down the stairs. This time, unfortunately, the welded connections at landing 3 above did not hold, and the whole stair branch, having lost all support, began falling down. By that time[, decedent] had already reached landing 1.5, where he laid in the prone (chest down) position in which he was later found dead. In the meantime, stair branch No. 4 on its way down landed directly on the railings of stair branch No. 2. In what turned out to be an unfortunate event, both railings survived the impact and supported stair branch No. 4 while it slid downward toward landing 1.5 and the south wall of the building. It was against [landing 1.5] that stair branch 4 finally came to rest. However, just before coming to rest, the bottom edge of the stair hit [decedent's] head[,] causing the gash from which he bled to death.

The explanation of why stair branch No. 2 did not fall down as well[ ] may lie on the fact that its [e]ast railing took the brunt of the impact of falling stair branch No. 4. This reduced considerably the forces that would have otherwise generated at the critical connections of the stair stringers at landing 1.5, which were thereby preserved."

## C. Decedent's Use of the Parking Garage

Decedent was at the garage with two friends, Reggie Haywood and Rio Huerta, 17 and 16 years old, respectively, when the collapse occurred. Haywood and Huerta both gave statements to the police at the time of the collapse. In July 2006, Haywood and Huerta gave evidentiary depositions.

Haywood testified in his evidentiary deposition that on April 4, 2006, decedent, Haywood, and Huerta met around 12 or 1 p.m. at decedent's house to walk around. Haywood believed all three skipped school or were suspended that day. Between 1 p.m. and around 5 p.m., the group walked Huerta's girlfriend home from school and went to a bowling alley and a different parking garage downtown. The group entered the garage where the accident took place between 5 p.m. and 6 p.m. Haywood admitted that the group arrived on foot and did not have a car parked in the garage. In fact, none owned a car or had a driver's license. According to Haywood's testimony, the group walked up a stairwell to the garage's roof, but Haywood could not remember whether they ascended the north or south stairwell.

Haywood testified that the group spent some time on the roof throwing pebbles at the walls. Haywood was uncertain about the amount of time the group spent on the roof, but it appears they spent

at least one hour and possibly as many as three or four hours there. At some point, Haywood and Huerta descended the ramp, losing sight of decedent. According to Haywood's testimony, he and Huerta told decedent to follow them but decedent did not.

According to Haywood's deposition testimony, Haywood and Huerta began looking for decedent when he did not immediately join them at the bottom of the ramp. While searching for decedent on the garage's roof, Haywood and Huerta heard a loud crash, but they believed it was a car accident. Haywood testified he and Huerta searched for decedent for "[l]ike three hours" before giving up the search between 9:30 p.m. and 10 p.m. and going home separately.

A police report Haywood gave the day after the accident indicates Haywood heard a crash while running down the ramp with Huerta. According to the report, Haywood told police that the group mistakenly believed they had caused a car accident by throwing rocks at a car and ran to avoid being arrested. The report indicates Haywood heard the crash while running down the ramp, not while he and Huerta were searching for decedent on the roof.

Huerta also gave an evidentiary deposition. According to Huerta's testimony, the three boys met after school and walked Huerta's girlfriend home. At that point, they went to a bowling alley and a different parking garage before entering the garage where the accident occurred and going to the roof. Huerta testified the group arrived at the garage between 4:30 p.m. and 5:30 p.m. but conceded they might have arrived as late as 6:30 p.m. Huerta denied seeing any "[n]o [t]respassing" signs; he believed the garage was a public place. Huerta testified the group ascended a stairwell to the roof and spent time throwing little pebbles at the garage's walls. Huerta agreed with Haywood that none of the three had a car parked in the garage, paid any money to park, owned a car, or had a driver's license.

In response to questions posed by the city's attorney, John Martin, Huerta testified to the following events:

"Q. *** [A]t some point you and [Haywood] got separated from [decedent], correct?

A. Yes.

Q. *** How did that occur?

A. We were on this level. I think it was either the second one or the third one, and we were walking around and there's like a little thing you can jump over, like a little ledge. [Haywood and I] had jumped over that and [decedent] was still on one of the levels and [Haywood and I] were walking up the ramp. That's when we heard the big boom when we got up towards the top and we thought it was a car crash so we ran to the edge to see what it was, but we didn't see anything.

Q. So all three of you were last together at what level of the [garage]?

A. Either the second or the third level, but I guess it was the second level that I can remember.

Q. *** And then you *** and [Haywood] went one way and [decedent]· went the other?

A. Last time I seen [sic] [decedent], he was still like standing right there by the ledge that we had jumped over and [Haywood and I] were jumping off. I thought [decedent] was behind [Haywood] and he wasn't. And by the time we got up to the top, that's when we heard the crash.

* * *

Q. *** So [you and Haywood] were walking up the ramp to go back upstairs to the third or fourth floor, correct?

A. Yeah, that's what I can remember.

Q. *** [W]hen was it that you were first aware that [decedent] wasn't with you anymore?

A. After we heard the loud noise, then [Haywood and I] had run up to the top off the ledge to see *** what it was or whatever. We thought it was a car crash, but we didn't see anything. Then we turned around and [decedent] was gone and we was [sic] yelling his name ***."

Huerta denied throwing rocks off the garage. According to Huerta's testimony, he and Haywood ran to the edge of the garage's roof after hearing the crash, thinking a car crash had occurred. At that point, they noticed decedent was missing and began looking for him. Huerta had loaned decedent a cell phone earlier in the day. Huerta called the phone but only heard a prerecorded message that the number was unavailable.

According to Huerta's testimony, he and Haywood searched for decedent for a few hours. They looked through the parking garage and called decedent's personal cell phone and the public safety building to see if decedent had been arrested. Huerta testified that he and Haywood went home separately around 8 p.m. after they were unable to find decedent.

A police report recounting an interview with Huerta the day after the accident matches his deposition testimony in most respects. However, the report states Huerta denied searching the garage's parking levels before going home.

Elizabeth Hallett testified that she worked for a local business located across the street from the garage and parked there every day. On April 5, 2006, Hallett parked on level 2 and walked to the north stairwell. Hallett opened the stairwell door and saw the collapsed

staircase. Debris and rubble blocked the stairwell. Hallett looked under the debris and saw decedent's body at the level 1.5 landing. Hallett notified MVPS superintendent Chapman, who immediately called emergency services. Decedent died before he could receive any medical care.

## D. Procedural History

On April 11, 2006, plaintiff filed a two-count complaint against the city. In September 2006, plaintiff added McClintock and Schomburg as defendants. In April 2008, plaintiff filed a "Second Amended Complaint" against the city, Schomburg, and McClintock. The complaint alleged the following theories of recovery: (1) willful and wanton misconduct in inspecting, maintaining, and repairing the stairwell pursuant to the recovery provisions of the Wrongful Death Act (740 ILCS 180/0.01 through 2.2 (West 2006)) (count I); (2) willful and wanton misconduct in inspecting, maintaining, and repairing the stairwell pursuant to the recovery provisions of the Survival Act (755 ILCS 5/27—6 (West 2006)) (count II); (3) negligence in inspecting, maintaining, and repairing the stairwell pursuant to the recovery provisions of the Wrongful Death Act (count III); (4) negligence in inspecting, maintaining, and repairing the stairwell pursuant to the Survival Act (count IV); and (5) negligence under *res ipsa loquitur* pursuant to the recovery provisions of the Survival Act (count IX).

Later in April 2008, the city filed a motion for summary judgment on grounds the Tort Immunity Act (745 ILCS 10/3—102(a) (West 2006)) and sovereign immunity protected it from liability. The city argued that it had no duty to decedent because he was not an "intended and permitted" user of the stairwell within the meaning of section 3—102 of the Tort Immunity Act (745 ILCS 10/3—102(a) (West 2006)). The city defined "intended" as anyone using the garage for a legitimate purpose. The city relied on the depositions of Huerta and Haywood to argue that decedent was not in the garage to park, use the bathroom, visit the MVPS office, or for any other intended purpose. Rather, decedent was simply loitering on the premises. Plaintiff argued decedent was an intended user of the stairwell because (1) decedent was using the stairwell as a pedestrian and (2) the garage was a public place based upon the effect of Danville Code section 114.01 (Danville Code of Ordinances §114.01(B) (adopted August 1, 1995)).

In September 2008, the trial court granted summary judgment in favor of the city in an extensive written order. The court's reasoning follows:

"Here, the decedent was using the stairway as intended[,] *i.e.*[,] as a stairway. [The city] contends he was not an 'intended' user since he had no legitimate business in the parking garage. He was not there to park, enter[,] or exit a vehicle and there were no municipal activities ongoing for which access to the parking garage was permitted. When one looks at the variety of cases parsing out the nature of the injured pedestrian's use of the street, the courts appear to carefully analyze the reason for the pedestrian's presence and whether it was reasonably related to the intended use of the property.

If the pedestrian has a legitimate reason for being on the municipal property which is reasonably and foreseeably related to the intended purpose of the property, liability is generally found. \*\*\*

\*\*\*

In this case, decedent had no legitimate reason for his presence in the stairway. By all accounts[,] the youths were loitering on or about the parking garage. They clearly were not there for any purpose related to the intended purpose of the stairway, *i.e.*, allowing parking patrons access to the garage or the street. They were not present because of their attendance at some event which permitted the use of the parking garage."

The court did not reach the question of whether sovereign immunity protected the city from liability.

The trial court also granted summary judgment in favor of Schomburg and McClintock. In October 2008, between the summary judgment order's entry and the filing of this appeal, plaintiff entered into a settlement agreement with Schomburg and McClintock. As stated, plaintiff thereafter voluntarily dismissed the counts against those defendants with prejudice.

This appeal followed.

## II. ANALYSIS

The question before us is whether decedent was an "intended" user of the stairwell within the meaning of section 3—102 of the Tort Immunity Act (745 ILCS 10/3—102(a) (West 2006)).

### A. Motion Taken With the Case

■ Plaintiff has filed a motion to strike all facts in the city's brief lacking cites to the record, as well as all arguments relying on facts not cited. Plaintiff argues the city has violated Supreme Court Rule 341(h)(6) (210 Ill. 2d R. 341(h)(6)), which requires the appellant to provide an accurate statement of facts "with appropriate reference to the pages of the record on appeal." While the rules do not require the appellee to include a statement of facts, the appellee must follow Supreme Court Rule 341(h)(6) if he or she chooses to do so. 210 Ill. 2d R. 341(i).

The city's brief contains a cite to the record only at the end of each paragraph of the statement of facts and lacks cites entirely in two paragraphs of its argument section. Supreme Court Rule requires a "[s]tatement of [f]acts *** with appropriate reference to the pages of the record on appeal." 210 Ill. 2d R. 341(h)(6). Rule 341(i) provides Rule 341(h)(6) applies to the appellee's brief to the extent the appellee includes the same. 210 Ill. 2d R. 341(i). Our review of the city's brief indicates the city provided the cites at the end of each paragraph of facts and these record cites support the facts stated throughout the paragraph and correspond to the information contained on the cited page of the record. The rule does not require the brief to contain a cite at the end of each sentence. Moreover, " '[w]here violations of supreme court rules are not so flagrant as to hinder or preclude review, the striking of a brief in whole or in part may be unwarranted.' " *Hurlbert v. Brewer*, 386 Ill. App. 3d 1096, 1101, 899 N.E.2d 582, 586 (2008), quoting *Merrifield v. Illinois State Police Merit Board*, 294 Ill. App. 3d 520, 527, 691 N.E.2d 191, 197 (1997). We deny the motion to strike.

## B. Standard of Review

Summary judgment is only appropriate "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2—1005(c) (West 2006). " 'In addition, the court must draw all reasonable inferences from the record in favor of the nonmoving party.' " *BlueStar Energy Services, Inc. v. Illinois Commerce Comm'n*, 374 Ill. App. 3d 990, 993-94, 871 N.E.2d 880, 885 (2007), quoting *Delaney Electric Co. v. Schiessle*, 235 Ill. App. 3d 258, 262, 601 N.E.2d 978, 982 (1992). Summary judgment is a drastic method of disposing of litigation and should only be granted where the movant's right to judgment is clear and free from doubt. *Williams v. Manchester*, 228 Ill. 2d 404, 417, 888 N.E.2d 1, 9 (2008). This court reviews a trial court's grant of summary judgment *de novo. Bagent v. Blessing Care Corp.*, 224 Ill. 2d 154, 163, 862 N.E.2d 985, 991 (2007).

## C. The Tort Immunity Act

Plaintiff argues that decedent, along with the general public, was an intended and permitted user of the stairwell because of the widely divergent uses to which the city put the garage. The city argues it intended only people with "legitimate business" to use the garage, including the stairwell.

### 1. *The Stairwell's Intended Uses*

■ Whether decedent was an intended user of the stairwell is a question of law, which falls initially to the trial court to decide. See

*Curtis v. County of Cook*, 98 Ill. 2d 158, 163, 456 N.E.2d 116, 119 (1983). This court reviews questions of law *de novo. Simich v. Edgewater Beach Apartments Corp.*, 368 Ill. App. 3d 394, 407, 857 N.E.2d 934, 944 (2006) ("question of a defendant's duty of care is a matter of law"). A local public entity, such as the city, has

> "the duty to exercise ordinary care to maintain its property in a reasonably safe condition for the use in the exercise of ordinary care of people whom the entity *intended and permitted* to use the property in a manner in which and at such times as it was reasonably foreseeable that it would be used." (Emphasis added.) 745 ILCS 10/3—102(a) (West 2006).

Section 3—102 is a codification of the common-law duty of all local public entities to maintain their property for the benefit of intended and permitted users. *Wagner v. City of Chicago*, 166 Ill. 2d 144, 152, 651 N.E.2d 1120, 1124 (1995). It provides no immunities or defenses but rather defines the duty of care owed by public entities. *Wagner*, 166 Ill. 2d at 152, 651 N.E.2d at 1124 (stating other sections of the Tort Immunity Act articulate immunities and defenses). The Tort Immunity Act is, however, in derogation of the common law and thus is strictly construed against the government entity seeking immunity. *Keener v. City of Herrin*, 385 Ill. App. 3d 545, 554, 895 N.E.2d 1141, 1150 (2008). "We need look no further than the property itself to determine the municipality's manifestations of intent with regard to use of the property by pedestrians." *Sisk v. Williamson County*, 167 Ill. 2d 343, 351, 657 N.E.2d 903, 907 (1995), citing *Wojdyla v. City of Park Ridge*, 148 Ill. 2d 417, 426, 592 N.E.2d 1098, 1102-03 (1992).

To determine an intended use of public property, courts examine the specific uses of the property on which the plaintiff was injured, not the general area's uses. See, *e.g.*, *Roberson v. City of Chicago*, 260 Ill. App. 3d 994, 997-98, 636 N.E.2d 776, 778 (1994) (examining the intended uses of median strip dividing four-lane highway, rather than the highway's intended uses). In our view, the stairwell was intended to provide access to the parking decks for the general public. See Danville Code of Ordinances §114.01(B) (adopted August 1, 1995) (declaring means of ingress and egress to city parking lots to be public places). MVPS superintendent Chapman and MVPS assistant superintendent Coffey both testified the stairwells were never locked. Further, the garage does not have a secured entrance or night security guard. Like the median strip and highway at issue in *Roberson*, the parking decks and the stairwell are not one contiguous space with identical uses. The city may not limit the stairwell's intended uses with reference to the parking lot's intended uses.

■ Here, decedent was using the stairwell for its intended purpose: ascending or descending the stairs on foot. Although Haywood's and Huerta's deposition testimonies differ substantially regarding their specific movements, both youths testified they were moving around the garage and told decedent to follow them. Rather than using the ramps, decedent used the stairwell. The city built the stairwell to provide pedestrian access to the garage. No evidence shows decedent was, for example, bicycling, roller skating, skateboarding, or driving down the stairwell. See, *e.g.*, *Curtis*, 98 Ill. 2d at 165, 456 N.E.2d at 120 (holding the passenger in a drag racing car was not within the class of persons the government intended to use the highways).

The city argues decedent was not an intended user of the stairwell because he was not using it to access his parked car. The city compares this case to *Greene v. City of Chicago*, 209 Ill. App. 3d 311, 567 N.E.2d 1357 (1991). In *Greene*, the court held a pedestrian walking to a friend's house was not an intended user of the street, even though he was injured in a curbside parking area. *Greene*, 209 Ill. App. 3d at 313-14, 567 N.E.2d at 1358. The court in *Greene* found the curbside parking area had two permitted uses: driving and parking, which necessarily included pedestrian access to parked cars. *Greene*, 209 Ill. App. 3d at 313-14, 567 N.E.2d at 1358. Because the *Greene* plaintiff was not driving or walking to his parked car, he was not an intended user of the curbside parking area. *Greene*, 209 Ill. App. 3d at 313-14, 567 N.E.2d at 1358. The city's comparison is inapposite. In this case, the city intended that the public use for the stairwell to ascend and descend the garage. The parking ramps themselves might have limited pedestrian uses, such as parking, using the MVPS office, using the restrooms, or attending public events, but the same is not true of the stairwell.

Parking lot entrances and exits are no different from sidewalks in that the intended users are pedestrians, not drivers and parkers as on roads and curbside parking areas, respectively. "Were we to measure the duty of care by the intent of individuals traveling over [the property], we would effectively negate section 3—102(a) of the Tort Immunity Act ***." *Wojdyla*, 148 Ill. 2d at 425, 592 N.E.2d at 1102. The city's argument decedent was not an intended user of the stairwell because he did not have what the city deems a legitimate purpose is misplaced. Both Haywood's and Huerta's testimony indicates that decedent was using the stairwell to either access or exit the parking garage. The inquiry ends there.

## 2. *Harm Within the Risk*

The city further argues decedent's possible violation of the city trespass ordinance (Danville Code of Ordinances §132.43 (adopted

July 19, 1983)) is evidence decedent was not an intended user of the stairwell. In our view, decedent's injuries were not within the risk contemplated by a violation of the trespass ordinance.

*Sullivan v. City of Hillsboro*, 303 Ill. App. 3d 650, 707 N.E.2d 1273 (1999), provides a useful comparison. In *Sullivan*, the plaintiff was injured when he struck a submerged pipe around 30 feet from shore while waterskiing on a lake owned and maintained by the city. *Sullivan*, 303 Ill. App. 3d at 651-52, 707 N.E.2d at 1275. The trial court held that the plaintiff was not an intended user of the lake because he was in violation of a city ordinance that prohibited waterskiing within 75 feet of the shore. *Sullivan*, 303 Ill. App. 3d at 652, 707 N.E.2d at 1275. The Fifth District Appellate Court reversed, reasoning that the plaintiff's injury was not within the type of harm that the ordinance was enacted to combat. *Sullivan*, 303 Ill. App. 3d at 653, 707 N.E.2d at 1276 (noting the city enacted the ordinance to protect swimmers from surfers and water skiers).

Here, the trespass ordinance was not designed to combat the type of injury decedent suffered. While neither party presented evidence regarding the intent of the ordinance's drafters in passing the law, Coffey testified he escorted vagrants out of the garage, including those sleeping in the stairwell, two or three times per month on average. Chapman testified she placed "no trespassing" signs at the stairwell's entrance to discourage vagrants from sleeping in the stairwells and teenagers from "hanging out" on the roof, prevent damage to vehicles by trespassers, and shield the public from injuries. Chapman stated the garage "is not a playground." However, while the trespass ordinance aims to keeps trespassers out of the garage, which includes the stairwell, due to its dangers, the harm decedent encountered (a falling staircase) was assuredly not within the type of harm the trespass ordinance was designed to protect against. As a result, decedent's possible violation of the trespass ordinance did not change his status as an intended user of the property.

For the reasons stated, we hold that as a matter of law decedent was an "intended" user of the garage stairwell within the meaning of section 3—102 of the Tort Immunity Act (745 ILCS 10/3—102(a) (West 2006)). Because intended users are always permitted users (*Boub v. Township of Wayne*, 183 Ill. 2d 520, 524, 702 N.E.2d 535, 537 (1998)), defendant also qualifies as a permitted user of the stairwell.

### III. CONCLUSION

Because the trial court did not address the question of sovereign immunity, we decline to do so. We reverse the court's grant of summary judgment as to all counts and remand with directions for the

trial court to determine the merits of the city's sovereign-immunity claim.

Reversed and remanded with directions.

KNECHT, J., concurs.

JUSTICE STEIGMANN, specially concurring:

Although I agree with the result in this case, I specially concur because the majority opinion views the scope of the "property" at issue one way for the purpose of determining who was a "permitted" user and another way for the purpose of determining who was an "intended" user.

The majority concludes that the scope of the property under section 3—102(a) (745 ILCS 10/3—102(a) (West 2006)) is the stairs themselves for the purpose of determining who was an intended user. However, the majority also appears to conclude that the scope of the property should be the parking garage as a whole when determining who was a permitted user. I disagree with this analysis. The scope of the property is either the stairs or it is the garage as a whole, but the scope should be the same when deciding who was an intended *and* permitted user.

The scope of the property in this case should be limited to the stairs. As such, a question of material fact exists as to whether the decedent was "permitted" to use those stairs for their "intended" use, as the majority puts it, of "ascending and descending" on the day of the accident.