2021 IL App (2d) 200502-U
No. 2-20-0502
Order filed May 20, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| BRUNING & ASSOCIATES, P.C., | ) | Appeal from the Circuit Court |
| | ) | of McHenry County. |
| Plaintiff and Counterdefendant- | ) | |
| Appellee, | ) | |
| v. | ) | No. 18-SC-311 |
| | ) | |
| MICHAEL EVERSMAN, | ) | |
| | ) | Honorable |
| Defendant and Counterplaintiff- | ) | Kevin G. Costello, |
| Appellant. | ) | Judge, Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Presiding Justice Bridges and Justice Birkett concurred in the judgment.

**ORDER**

¶ 1   *Held*:   In suit for unpaid attorney fees, in which defendant brought counterclaim alleging various forms of legal malpractice, the trial court did not err in (1) denying defendant's untimely and undeveloped request for additional time to obtain an expert witness on the issues raised in plaintiff's motion for summary judgment on the counterclaim; and (2) granting summary judgment for plaintiff.

¶ 2   Plaintiff and counterdefendant, Bruning & Associates, P.C., (Bruning) represented defendant and counterplaintiff, Michael Eversman, in Eversman's dissolution proceedings. Bruning filed a small claims complaint against Eversman, seeking payment of unpaid attorney fees. Eversman filed a counterclaim, alleging various claims of legal malpractice. The circuit court

of McHenry County granted summary judgment for Bruning. Eversman timely appeals. Eversman argues that the trial court erred (1) in denying Eversman's request for additional time to obtain an expert witness and (2) in granting Bruning's motion for summary judgment. We affirm.

¶ 3                          I. BACKGROUND

¶ 4               A. The Dissolution and Marital Settlement Agreement

¶ 5     Eversman and his former wife, Laura J. Eversman, were married on April 21, 1990. Laura petitioned for dissolution of the marriage on January 15, 2016. Eversman retained Bruning to represent him in the proceedings. The parties settled with the assistance of the trial court. On November 18, 2016, after a prove-up hearing, the court entered a judgment of dissolution of the marriage, which incorporated the parties' marital settlement agreement (MSA).

¶ 6     As is relevant here, the MSA provided for a $75,000 lump sum payment to Laura, instead of monthly maintenance, to be paid from one of Eversman's retirement accounts. Eversman owned three retirement accounts that were addressed in the MSA:

>    (1) a "FedEx Retirement Savings Plan 401(k) with Vanguard, with an approximate value $498,445.09 as of September 26, 2016" (FedEx Savings Plan);
>
>    (2) a "FedEx pension, which includes [Eversman's] non-marital Flying Tigers pension" (FedEx Pension Plan); and
>
>    (3) a "Portable Pension through Federal Express with a lump sum value of $71,004.12 as of September 26, 2016" (Portable Pension Plan).

The MSA provided: (1) Laura was "awarded $321,383.35 from the [FedEx Savings Plan]" and "[t]his sum represents an overall set-off of [Laura] receiving 50% of the entire marital estate, plus $75,000, in lieu of maintenance"; (2) Laura was "awarded 50% of the marital portion of the [FedEx Pension Plan]"; (3) Eversman was "awarded 100% of the non-marital portion of the [FedEx

Pension Plan], which includes the Flying Tigers portion"; and (4) Eversman was awarded "his [Portable Pension Plan] through Federal Express as his sole and separate property." The MSA further provided that the "401(k) and pension shall be distributed pursuant to Qualified Domestic Relations Orders." The MSA stated: "The Wife and/or her counsel shall be responsible for the preparation of the QDRO and other required documents." The MSA also provided for equalization of attorney fees paid through marital funds and otherwise evenly distributed marital assets.

¶ 7                    B. Bruning's Small Claims Complaint

¶ 8     On January 30, 2018, Bruning filed a complaint in small claims court, seeking $2410.64 in unpaid attorney fees.

¶ 9                    C. Eversman's Answer and Counterclaim

¶ 10    On April 6, 2018, Eversman filed an answer with affirmative defenses and a counterclaim, alleging legal malpractice and seeking over $100,000 in damages. (The matter was subsequently transferred to the law division.) In his counterclaim, Eversman alleged that Bruning charged "unreasonable and excessive attorney fees" and that Eversman was required to pay a new attorney to correct certain errors. Eversman further alleged that Bruning urged him to accept the MSA causing him to pay substantially more to Laura than what a fair settlement would have required. The counterclaim also alleged that Bruning breached the standard of care in the following ways:

> (1) "improperly urged and pressured" him into accepting an MSA that "clearly was not fair or reasonable";
>
> (2) "incorrectly advised [him] that the Court would award, at the very minimum, what was contained in the [MSA]";

(3) "created QDRO errors by dividing all pensions when, in fact, even the [MSA] should not or did not require such a thing, causing [him] to spend over $4,000.00 in other attorney fees to correct the mistakes of Bruning";

(4) "required and pressured" him into paying Laura's attorney fees;

(5) engaged in double billing, "charging for two attorneys at Bruning, when the case was transferred from one attorney to the other inside the firm, thereby in essence doubling the amount of money";

(6) "erroneously advised [him] that he would have to pay spousal maintenance *** in the amount of $75,000.00"; and

(7) "improperly valued, or failed to properly value, the marital assets, resulting in a disproportionate share of the assets, in addition to spousal maintenance."

¶ 11                    D. Bruning's Answer and Affirmative Defense

¶ 12    On May 30, 2018, Bruning filed an answer and an affirmative defense. As its affirmative defense, Bruning asserted that Eversman should be collaterally estopped from relitigating whether the MSA was fair and reasonable. That issue had already been decided by the trial court after Eversman had a full and fair opportunity to litigate those issues.

¶ 13                    E. Bruning's Motion for Summary Judgment

¶ 14    The parties conducted discovery through October 9, 2019, when Bruning was granted leave to file a motion for summary judgment. In its summary judgment motion, filed on October 11, 2019, Bruning argued that Eversman's claims relating to the fairness and reasonableness of the MSA were barred by the doctrine of collateral estoppel, that Eversman failed to allege actual, actionable damages, and that Eversman failed to present any evidence establishing that Bruning breached its duty of care. Bruning attached the following exhibits: (A) the dissolution judgment;

(B) Bruning attorney Mary Sump's deposition testimony; (C) Eversman's deposition testimony; (D) the MSA; (E) pages 1-8 of the transcript from the November 18, 2016, prove-up hearing[1]; (F) a QDRO dated November 18, 2016, which concerned the FedEx Savings Plan, assigning to Laura $321,383.35; (G) a QDRO dated November 18, 2016, which concerned the FedEx Pension Plan, assigning to Laura "50% of the 'marital interest' in the Participant's accrued benefit under the Plan" and providing the date of the marriage and the dissolution; and (H) Eversman's answer and counterclaim.

¶ 15                              1. *Sump's Deposition Testimony*

¶ 16    Sump provided the following relevant testimony at her deposition. Sump testified that Jonathan Thornton, another attorney at Bruning, had originally represented Eversman and that Sump had taken over the case in June 2016. Thereafter, Thornton assisted Sump as needed. Sump was asked how the parties determined that Laura would receive a $75,000 lump sum payment instead of monthly maintenance. Sump explained that the parties had participated in a pretrial conference with Judge Nader on July 26, 2016. During the pretrial conference, the judge recommended that Eversman consider paying his ex-wife a $75,000 lump sum, instead of maintenance. Sump explained that, based on statutory guidelines, Eversman's monthly maintenance payment to Laura would have been about $1500. The $75,000 amount was based on a $1500 monthly payment, payable "for four years and some months." Sump explained: "Mr. Eversman was wanting to retire at around age 65. So that would have provided that his maintenance obligation would be done by the time he was ready to retire." Sump stated that it was

---

[1]The partial transcript consists of only Laura's testimony. Eversman's testimony begins on the bottom of page 8 but no other pages are included.

impossible to calculate what the total amount paid over Eversman's lifetime would have been if he had chosen the monthly payment. Sump testified that she explained to Eversman the tax advantages of making the lump sum payment.

¶ 17 Sump testified that she reviewed the MSA with Eversman "numerous times" before the date of the prove-up hearing. She provided Eversman with a copy on the morning of the hearing but could not specifically recall if she went over it with him that day. Eversman had "[a]t least a few hours" to review the MSA before the hearing. Sump testified that Laura's attorney prepared the QDROs. Sump had reviewed the QDROs and requested a few changes. Sump testified that the QDROs were not "erroneous or wrong"; the plan administrator made errors in executing the distribution of the funds. She testified: "[T]here was an error in the amount of money and which retirement accounts were to be distributed." When asked why Eversman was required to pay Laura's attorney fees, Sump explained that he was not, stating: "[B]oth parties paid all of their attorney's fees from marital funds during the divorce case; and by the end of the divorce case, both parties had paid equal amounts to their attorneys for attorney's fees [*sic*]." Sump further testified that, before the divorce was finalized, Sump told Eversman that he had the option of obtaining updated discovery documents. Eversman told her that he did not want to do further discovery or view additional financial documents; Eversman wanted to conclude the case with the agreement that had been previously negotiated.

¶ 18                                    2. *Eversman's Deposition Testimony*

¶ 19 Eversman provided the following relevant testimony at his deposition. Eversman was shown the MSA and agreed with the provision indicating that he had " 'freely and voluntarily entered into this agreement of his or her own volition, free from any duress or coercion, and with full knowledge of each and every provision contained in this agreement and the consequences

thereof.' " He also agreed that when he signed the MSA, he believed it to be " 'fair, reasonable, and not unconscionable.' " Eversman testified that he learned afterward that Sump did not include a provision that would require Laura to pay him two months' rent. He agreed that he read the document before he signed it. He testified that Sump did not review the MSA with him on the morning of the hearing. Eversman testified that the MSA accurately reflected the parties' agreement concerning the FedEx Savings Plan, the FedEx Pension Plan, and the Portable Pension. However, he testified that Sump "lumped [the traditional pension] in with the Flying Tigers. And only the traditional was supposed to have been chopped. The Flying Tigers was not supposed to have been touched, and the [P]ortable [P]ension was not supposed to be touched." Eversman later learned that, in implementing the QDROs, "[t]hey chopped all three" pensions (incorrectly including the nonmarital Flying Tigers pension and Portable Pension in the division). Eversman stated: "The Flying Tigers was separate. The [P]ortable [Pension] was separate. The traditional was separate." He testified that "when [Sump] sent the documents to [Laura's attorney] as being this, it was over his interpretation that he chopped all three." When Sump told Eversman that she would charge him to fix the problem, he hired a different attorney, Mike Stetler, to do so. Stetler told him that the provision in the MSA addressing the pensions was "poorly constructed."

¶ 20    Eversman also testified that there was a $1500 discrepancy in favor of Laura contained in section 2.3 of the MSA addressing the parties' bank accounts. Eversman stated that he "ran the numbers" with Laura and that she agreed that the numbers were incorrect. Eversman told Laura that she owed him $1500, but she refused to pay him, stating that she was " 'going to agree with Mary Sump's figures.' " Eversman brought it to Sump's attention before the MSA was finalized. Eversman agreed that he directed Mary not to obtain updated financial statements, because he did

not want the divorce proceedings to be delayed. Eversman signed the MSA knowing about the discrepancy.

¶ 21    Eversman testified that Sump gave him a copy of the MSA on the morning of the hearing and that he had about 40 minutes to review it. Eversman did not talk to Sump before the hearing; he did not have any questions for Sump at that time. Eversman agreed that, at the hearing, he testified that he had read the MSA in its entirety, that he understood all of its terms, that he agreed to be bound by its terms, that no one forced or coerced him into signing it, that he entered into it willingly and voluntarily, and that he felt that the contents of the MSA were fair and equitable to both himself and Laura. Eversman also agreed that, before the hearing, he told Sump that he approved of the MSA.

¶ 22    Eversman testified that, when Sump took over handling his divorce, she told him, " 'Well, now we have to start all over again.' " Eversman also testified that, when he asked Sump why he had to pay support to Laura, she replied, " 'It's the law.' " Eversman never knew how Sump arrived at the $75,000 amount. Sump only mentioned "length of marriage" and "income." Eversman agreed that he made more money than Laura throughout the marriage. When asked whether he thought Sump arrived at the wrong amount, Eversman replied: "Not sure." Eversman was also "[n]ot sure" whether anyone ever told him that the amount was wrong or whether he would have gotten a better settlement had he been represented by a different firm. Eversman agreed that he was given a choice between paying Laura $1500 a month for life or a $75,000 lump sum and that he chose to pay Laura the lump sum. Eversman had a lot of discussions with Sump on the issue. Eversman testified that the $75,000 lump sum was more attractive to him because he wanted to retire. Sump also had Eversman meet with a "financial person" to discuss the figures. He stated: "We were going back and forth on her figures all the time."

¶ 23 Eversman testified that all of the attorney fees were paid out of the FedEx Savings Plan, which was marital property. Eversman was questioned regarding his claim that Bruning had double-billed him. In his answers to interrogatories, Eversman submitted over 50 pages of bills that he had received from Bruning during its representation. When shown the documents and asked to point out the charges that he was disputing, Eversman testified that he was disputing every one of Bruning's charges, stating: "I felt that double-billing me for the same divorce was not right." The following colloquy then took place:

"Q. Okay. So where are the double-billing, which entries?

A. From Jonathan Thornton to Mary Sump, the billing for Jonathan Thornton to Mary Sump were the same documents, the same divorce.

Q. So did you compare the time entries from Jonathan and Mary to see if they worked on the same thing?

A. Yes. They were the same thing.

Q. They were the same thing. That's your understanding?

A. Yes.

Q. So if Mary went to court in August and Jonathan went to court in May, those were the same thing?

A. Yes.

Q. So you should only pay for one of those, even if the judge orders that you attend both?

A. Yes.

Q. And if Mary writes a letter about the status of things in October and Jonathan writes a letter about the status of things in March, you are saying those are duplicative?

A. Yes."

¶ 24       F. Eversman's Response to Motion for Summary Judgment

¶ 25    On November 21, 2019, Eversman requested, and was granted, additional time "[d]ue to the press of business" to file his response to Bruning's motion for summary judgment.

¶ 26    On December 31, 2019, Eversman filed his response, which included a statement of disputed material facts, asserting that Bruning breached the standard of care in the following ways: (1) by charging unreasonable and excessive fees; (2) by pressuring Eversman into accepting the MSA "by telling him that this was the law and he had to agree"; (3) by creating a QDRO that contained errors; (4) by advising Eversman to agree to pay Laura's attorney fees; (5) by advising Eversman to agree to a $75,000 lump sum payment to Laura, instead of maintenance; (6) by "improperly valuing marital assets, which resulted in a disproportionate settlement, including but not limited to improper maintenance calculation"; (7) by failing to explain the MSA to Eversman before its entry on November 18, 2016; and (8) by failing to include certain terms in the MSA, such as two months of rent from Laura. In support, Eversman attached as exhibits: (A) his affidavit, (B) portions of his deposition testimony, and (C) his answer and counterclaim. Eversman asked that the motion for summary judgment be denied. In the alternative, Eversman requested "time to obtain an expert witness to opine on the issues that would certainly create further issues of material facts, prior to the Court's ruling on the summary judgment."

¶ 27                          G. Bruning's Reply

¶ 28    On January 21, 2020, Bruning filed a reply, a "Statement of Material Facts in Support of the Motion for Summary Judgment," a reply to Eversman's statement of facts, and a motion to strike certain paragraphs in Eversman's affidavit.

¶ 29                       H. Eversman's Amended Affidavit

¶ 30    On February 7, 2020, the trial court ordered Eversman to file an amended affidavit. Eversman did so. In his amended affidavit, Eversman alleged: (1) he asked Sump to include language in the MSA providing for Laura to pay him rent for the last 60 days Laura would be living in the parties' residence; (2) he was pressured by Sump to enter into the MSA, *e.g.*, she told him, " 'this is the law,' " in relation to the MSA's terms; (3) when he signed the MSA, he believed it to be in his best interest based on what Sump had told him; (4) Sump did not review the MSA with him on the morning of the prove-up hearing; (5) Sump never explained to him how the $75,000 lump sum payment to Laura was calculated; (6) the QDROs divided three of his pensions instead of only one as provided in the MSA; (7) when he told Sump that his pensions were incorrectly divided and asked her to fix it, she told him that she would charge him $2000; and (8) he has been damaged by Bruning by being ordered to pay Laura's attorney fees, by incurring additional fees from another attorney to fix the QDROs, by losing out on rent, and by being advised to accept an unreasonable MSA, which included an unreasonable $75,000 lump sum payment.

¶ 31                          I. The Trial Court's Ruling

¶ 32    A hearing on the motion for summary judgment took place on February 19, 2020. Following the hearing, the trial court entered a written order granting summary judgment. Regarding Eversman's request for additional time to obtain an expert, the court noted that, although Eversman had previously filed a motion for additional time to file his response, which was granted, he had not requested time to obtain an expert witness. The court also found that Eversman did not comply with the requirements of Supreme Court Rule 191(b) (eff. Jan. 4, 2013), in that Eversman did not name the expert or disclose what he believed the expert would testify to if sworn. Thus, the court concluded that Eversman's request was both untimely and insufficient. Thereafter, the court thoroughly addressed, in turn, each of Eversman's allegations, and concluded

that there were no genuine issues of material fact as to any claims of legal malpractice against Bruning and that Bruning was entitled to judgment as a matter of law. Regarding Eversman's claim that the terms of the MSA were unreasonable, the trial court additionally found that Eversman was collaterally estopped from making that claim, because the dissolution court had expressly found that the MSA's terms were reasonable.

¶ 33    This timely appeal followed.

¶ 34                                    II. ANALYSIS

¶ 35                    A. Denial of Leave to Obtain an Expert Witness

¶ 36    We first consider Eversman's argument that the trial court erred in denying his request for additional time to obtain an expert witness. Bruning responds that the court's decision was well within the bounds of reason because Eversman's untimely request failed to comply with Supreme Court Rule 191(b) (eff. Jan. 4, 2013). We agree with Bruning.

¶ 37    Supreme Court Rule 191(b) provides:

"If the affidavit of either party contains a statement that any of the material facts which ought to appear in the affidavit are known only to persons whose affidavits affiant is unable to procure by reason of hostility or otherwise, *naming the persons and showing why their affidavits cannot be procured and what affiant believes they would testify to if sworn, with his reasons for his belief*, the court may make any order that may be just, either granting or refusing the motion, or granting a continuance to permit affidavits to be obtained, or for submitting interrogatories to or taking the depositions of any of the persons so named, or for producing documents in the possession of those persons or furnishing sworn copies thereof. The interrogatories and sworn answers thereto, depositions so taken, and sworn

copies of documents so furnished, shall be considered with the affidavits in passing upon the motion." (Emphasis added.) Ill. S. Ct. R. 191(b) (eff. Jan. 4, 2013). "Failure to comply with Rule 191(b) defeats an objection on appeal that insufficient time for discovery was allowed." *Giannoble v. P & M Heating & Air Conditioning, Inc.*, 233 Ill. App. 3d 1051, 1064 (1992). A trial court's decision to deny a motion for discovery under Rule 191(b) is reviewed for an abuse of discretion. *National Tractor Parts Inc. v. Caterpillar Logistics Inc.*, 2020 IL App (2d) 181056, ¶ 69. "A trial court abuses its discretion only when no reasonable person would accept the view adopted by the trial court." *Id.*

¶ 38    Here, Eversman failed to file *any* affidavit under Rule 191(b). Indeed, Eversman makes no reference at all to Rule 191(b) in his briefs on appeal, arguing only generally that the case was "not at the expert disclosure stage" and that, because he "requested leave to obtain an expert affidavit," he should have been granted time to disclose one. That does not explain his failure to comply with Rule 191(b). In addition, as noted, Rule 191(b) requires certain disclosures. Eversman did not even attempt to name any proposed expert, telling the trial court at the hearing that they "don't have the expert yet." Nor did Eversman attempt to show what an expert would testify to if sworn, stating only generally that "all of these issues that are being brought up [by Bruning] require expert testimony." "Merely alleging that certain discovery matter may shed light on the *** issue[s] is a general assertion, not a fact. Rule 191(b) requires facts, not conclusions." *Giannoble*, 233 Ill. App. 3d at 1065. Given Eversman's utter failure to comply with Rule 191(b), we find no abuse of discretion in the trial court's ruling. See *Schultz v. Hennessy Industries, Inc.*, 222 Ill. App. 3d 532, 543 (1991) (finding that the trial court properly denied the plaintiff's request for additional discovery under Rule 191(b) where the affidavit failed to set forth what the prospective witness would testify to).

¶ 39    We also find no abuse of discretion in the trial court's additional determination that Eversman's request was untimely made. The judgment of dissolution was entered on November 18, 2016. Eversman filed his counterclaim on April 6, 2018. Bruning filed its motion for summary judgment on October 11, 2019, giving Eversman until December 2, 2019, to respond. On November 21, 2019, Eversman requested additional time to respond but made no mention of his need to obtain an expert. The trial court granted Eversman's request, giving him until December 30, 2019. Eversman had ample time to comply with Rule 191(b).

¶ 40    Eversman's reliance on *Williams v. Covenant Medical Center*, 316 Ill. App. 3d 682 (2000), and *Besco v. Henslee, Monek & Henslee*, 297 Ill. App. 3d 778 (1998), does not warrant a different conclusion, as each case is readily distinguishable. In *Williams*, the reviewing court held that the trial court abused its discretion in denying the plaintiffs' motion for a continuance to obtain an affidavit from their expert, where the summary judgment motion was premature, the plaintiffs had proceeded diligently, the plaintiffs had a reason to delay their request to continue, and the plaintiffs had named an expert. *Williams*, 316 Ill. App. 3d at 692-93. In *Besco*, when the plaintiffs failed to disclose their expert witness and present him for deposition within the required time, the trial court sanctioned the plaintiffs under Supreme Court Rule 219(c) (eff. July 1, 2002) by barring them from naming an expert. The reviewing court held that the sanction was unjust under the circumstances, where immediately after the defendants filed their motion to bar, the plaintiffs properly responded by disclosing their expert and filing a response to the motion explaining the reasons for the delay. *Besco*, 297 Ill. App. 3d at 783-84. Here, unlike in *Besco* and *Williams* the court found that Eversman did not proceed diligently and, moreover, Eversman made no effort to subsequently comply by naming an expert.

¶ 41 We are also not persuaded by Eversman's reliance on *Nettleton v. Stogsdill*, 387 Ill. App. 3d 743 (2008), which he cited in his reply brief and at oral argument. Eversman argued at oral argument that, based on *Nettleton*, he was not required to have disclosed an expert at this stage of the proceedings and that it was improper for the trial court to grant summary judgment for Bruning before Eversman did so. *Nettleton* is readily distinguishable. In *Nettleton*, we held that, in the plaintiff's legal malpractice case, the plaintiff's failure to disclose an expert witness before the summary judgment motion did not warrant summary judgment on the issue of whether the defendants breached their duty to the plaintiff. *Id.* at 757. In so holding, we specifically noted that the defendants established the standard of care against which their conduct was to be measured by their admissions in the answer to the plaintiff's complaint. *Id.* at 758. We further noted that the alleged negligent actions—the intentional dismissal of a cause of action, without the client's consent, because the attorney was unprepared—would "constitute negligence both well within the common knowledge of lay persons and so grossly apparent that a lay person would have no difficulty in appraising it." *Id.* at 757-58. Because expert testimony was not required to establish the standard of care, the failure to disclose an expert was not a proper basis for summary judgment. Here, Eversman makes no argument that expert testimony was not required. In any event, *Nettleton* does not preclude the trial court from granting summary judgment before the plaintiff in a legal malpractice case has retained an expert. Nor does it excuse Eversman's failure to comply with Rule 191(b).

¶ 42                                    B. Summary Judgment

¶ 43 Eversman argues that the trial court erred in granting summary judgment, because he presented a genuine issue of material fact on each of his allegations.

¶ 44    Summary judgment is proper where the pleadings, admissions, depositions, and affidavits on file demonstrate that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2018). Although a drastic means of disposing of litigation, summary judgment is, nonetheless, an appropriate measure to expeditiously dispose of a suit when the moving party's right to the judgment is clear and free from doubt. *Gaston v. City of Danville*, 393 Ill. App. 3d 591, 601 (2009). "While a plaintiff does not need to prove its entire case during summary judgment, it must present some evidentiary facts as support for its cause of action. [Citation.] If a plaintiff fails to establish one element of the cause of action, summary judgment in favor of the defendant is appropriate." *National Tractor Parts Inc.*, 2020 IL App (2d) 181056, ¶ 38. This court conducts *de novo* review of a summary judgment ruling. *Bruns v. City of Centralia*, 2014 IL 116998, ¶ 13.

¶ 45    "To state a cause of action for legal malpractice, the plaintiff must allege facts to establish (1) the defendant attorney owed the plaintiff client a duty of due care arising from an attorney-client relationship, (2) the attorney breached that duty, (3) the client suffered an injury in the form of actual damages, and (4) the actual damages resulted as a proximate cause of the breach." (Internal quotation marks and citation omitted.) *Nelson v. Quarles and Brady, LLP*, 2013 IL App (1st) 123122, ¶ 28.

"Only when an attorney fails to exercise a reasonable degree of professional care and skill will he be liable to his client." *Sexton v. Smith*, 112 Ill. 2d 187, 193 (1986). Generally, a legal malpractice plaintiff must establish through expert testimony the standard of care against which a defendant attorney's conduct must be measured, and the failure to do so will be fatal to the plaintiff's cause of action. *Nettleton*, 387 Ill. App. 3d at 757. The exception is where the common knowledge or experience of laypersons is extensive enough to recognize or infer negligence from the facts, or

where an attorney's negligence is so grossly apparent that a layperson can easily assess it. *Id.* (being unprepared for trial and dismissing first dissolution petition without client's consent would constitute negligence well within common knowledge of laypersons); *Gray v. Hallett*, 170 Ill. App. 3d 660, 664 (1988) (failing to obtain service of process within limitations period).

¶ 46     Eversman's counterclaim consisted of the following: (1) claims regarding the fairness and reasonableness of the MSA and Sump's handling of the settlement; (2) a claim regarding the alleged negligent preparation of the QDROs; (3) a claim regarding alleged improper billing; (4) a claim that Bruning improperly valued the marital assets; and (5) a claim regarding Eversman's payment of Laura's attorney fees. In his response to Bruning's motion for summary judgment, Eversman also alleged that Bruning failed to include a provision in the MSA, which Eversman requested, requiring Laura to pay two months' rent. We will address each in turn.

¶ 47              1. *Claims Regarding the Fairness and Reasonableness of the MSA*

¶ 48     The trial court held that Eversman failed to present evidence sufficient to raise a genuine issue of fact as to whether the terms of MSA were unfair and unreasonable; rather, Eversman presented nothing but conclusory allegations. In considering the issue, the court focused on the following allegations made by Eversman in his counterclaim related to the MSA: that Sump improperly urged Eversman to accept an MSA that was unfair and unreasonable; that Sump incorrectly advised Eversman that the court would award, at the very minimum, what was contained in the MSA; and that Sump erroneously advised Eversman that he would have to pay $75,000 in maintenance. Eversman alleged that as a result of Bruning's negligence, he paid "more than what a fair settlement would have been."

¶ 49     As the trial court noted, to prevail in a legal malpractice action alleging negligent handling of a settlement, the plaintiff must show that the settlement terms were less favorable than he could

reasonably expect without malpractice. See *Brooks v. Brennan*, 255 Ill. App. 3d 260, 270 (1994). Here, as payor, Eversman would have to show that he paid more than what a fair settlement would have been. Eversman did not do so here. Eversman's unsupported conclusory allegations contained in his response and amended affidavit that the terms of the MSA were unfair and unreasonable are insufficient to raise a genuine issue of material fact. See *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 132 (1992) ("Statements in an affidavit which are based on information and belief or which are unsupported conclusions, opinions, or speculation are insufficient to raise a genuine issue of material fact.") Eversman's argument on appeal fares no better. In his initial brief on appeal, Eversman asserts that "[t]his Honorable Court must review the Response to the Motion to [*sic*] Summary Judgement [*sic*] and after doing so will determine that factual questions existed." However, Eversman does not direct us to anything to support his claim. "[I]t is neither the function nor the obligation of this court to act as an advocate or search the record for error." (Internal quotation marks and citation omitted.) *XLP Corp. v. County of Lake*, 359 Ill. App. 3d 239, 256 (2005). Eversman points to only his deposition testimony that the MSA was not properly explained to him. However, even if Sump breached the standard of care by failing to properly explain the terms of the MSA to Eversman, absent evidence that those terms were unfair and unreasonable, Eversman's claim fails. See *Nettleton*, 387 Ill. App. 3d at 752 (if the outcome in the underlying action was as or more favorable to the malpractice plaintiff then he could have achieved if the malpractice defendant had not been negligent, then the plaintiff cannot be said to have been injured in the manner he alleged and so is not entitled to any damages). Indeed, Eversman testified that, when faced with a $1500 permanent monthly payment or a $75,000 lump sum, he chose the lump sum because he wanted to retire. His allegation that he did not understand how the figures were calculated does not mean that the numbers were not fair and equitable. When

asked whether he thought Sump arrived at the wrong amount, Eversman replied: "Not sure." Eversman was also "[n]ot sure" whether anyone ever told him that the amount was wrong or whether he would have gotten a better settlement if he had been represented by a different firm. He presented no such evidence that the $75,000 was unreasonable or excessive.

¶ 50    Eversman also argues that whether the terms of the MSA were fair and reasonable was a legal conclusion that required expert testimony. Eversman, however, failed to present such expert testimony and, as we found above, the trial court did not abuse its discretion in denying Eversman's insufficient and untimely request to obtain an expert.

¶ 51    Eversman also argues that the trial court erred in finding that, because the dissolution court found that the MSA was fair, reasonable, and equitable, collateral estoppel barred Eversman from arguing otherwise. Given our holding that Eversman failed to raise a genuine issue of material fact on the fairness and reasonableness of the MSA, we need not review the trial court's additional finding that Eversman's challenge to the MSA was barred by collateral estoppel.

¶ 52    *2. Claim Regarding the Alleged Negligent Preparation of the QDROs*

¶ 53    Eversman alleged that Bruning created "QDRO errors by dividing all pensions when, in fact, even the [MSA] should not or did not require such [a] thing, causing [him] to spend over $4,000.00 in other attorney fees to correct the mistakes of Bruning."

¶ 54    The trial court correctly found that Eversman's allegation was at odds with the language of the MSA, which specifically provided that Laura and her counsel would be responsible for preparing the QDROs. The court further found that, even if it were to expand Everman's claim as one alleging negligent *review* of the QDROs, the claim still fails. We agree.

¶ 55    Eversman argues that he presented evidence showing that Bruning caused him damages, because he had to retain new counsel to fix the issues with the QDRO. However, Eversman has

failed to point to any evidence showing an error in the QDROs. Eversman had three retirement accounts: the FedEx Savings Plan, the FedEx Pension Plan, and the Portable Pension Plan. Under the MSA, Laura was to receive 50% of the FedEx Savings Plan, plus the $75,000 lump sum maintenance, and 50% of the marital portion of the FedEx Pension Plan. The first QDRO correctly ordered that Laura be awarded $321,383.35 from the FedEx Savings Plan. The second QDRO, which concerned the FedEx Pension Plan, correctly ordered that Laura be assigned "50% of the 'marital interest' in the Participant's accrued benefit under the Plan." It provided the date of the marriage and the dissolution. It made no mention of the Portable Pension Plan. Eversman testified that "[t]hey chopped all three" pensions. However, there is nothing on the face of the QDROs that indicates an error. Indeed, Sump testified that the QDROs were not "erroneous or wrong." Rather, the plan administrator made errors in executing the distribution of the funds. Thus, Eversman has failed to present evidence sufficient to raise a genuine issue of material fact regarding Bruning's alleged negligence with respect to the QDROs.

¶ 56                    3. *Claim Regarding Alleged Improper Billing*

¶ 57    Eversman alleged that Bruning breached the standard of care by engaging in double billing, "charging for two attorneys at Bruning, when the case was transferred from one attorney to the other inside the firm, thereby in essence doubling the amount of money."

¶ 58    The trial court correctly found that Eversman failed to produce any evidence to support this allegation. First, as the court noted, generally, the reasonableness of attorney fees is a subject that requires expert testimony. See *Timothy Whelan Law Associates, Ltd. v. Kruppe*, 409 Ill. App. 3d 359, 367 (2011) (the reasonableness of attorney fees and the necessity of services provided "were the subject[s] of expert rather than lay testimony"); see also *In re Marriage of Salata*, 221 Ill. App. 3d 336, 338-339 (1991) ("Generally ***, case law establishes that the reasonableness of

an attorney's fees must be shown by expert testimony either by the petitioning attorney, an outside attorney or both.") Nevertheless, the court also noted that Eversman's claim—that he was billed twice for the same work—would have been "patently obvious from the billing records," yet Eversman still failed to put forth any evidence to support his allegation. Indeed, when presented at his deposition with the billing statements that he had received from Bruning and asked which charges he was disputing, he simply indicated that he was disputing every charge. The mere fact that two different attorneys at Bruning worked on Eversman's divorce is insufficient to raise a genuine issue of fact that he was improperly double billed.

¶ 59    Eversman also argues that the trial court erred in "determining [the] factual question" of whether Bruning's legal fees were reasonable. However, that is not what the court did. Instead, the court found that Bruning failed to introduce any facts to support his claim.

¶ 60            4. *Claim Regarding Alleged Improper Valuation of Marital Assets*

¶ 61    Eversman alleged that Bruning "improperly valued, or failed to properly value, the marital assets, resulting in a disproportionate share of the assets, in addition to spousal maintenance." On appeal, Eversman argues that an improper calculation by Bruning in the MSA resulted in Laura receiving $1500 more than she should have.

¶ 62    The trial court correctly found that Eversman failed to provide any facts to show that any assets or maintenance were improperly calculated.

¶ 63    First, we note that Eversman failed to present evidence sufficient to raise a genuine issue of the fact that the $75,000 lump sum maintenance was improperly calculated. Indeed, when asked whether Sump arrived at the wrong amount, he responded: "Not sure." As noted above, Eversman has failed to establish that the terms of the MSA, including the $75,000, were unfair and unreasonable.

¶ 64    Regarding the alleged $1500 misvaluation, Eversman testified that there was a $1500 discrepancy in favor of Laura contained in section 2.3 of the MSA regarding the parties' bank accounts. He testified that he "ran the numbers" with Laura and that she agreed that the numbers were incorrect. Eversman told Laura that she owed him $1500, but she refused to pay him, stating that she was "going to agree with Mary Sump's figures." Eversman has failed to direct this court to anything, other than his conclusory testimony, showing precisely which asset was miscalculated or how he determined the amount.

¶ 65    We note too that Eversman testified that he brought the issue regarding the $1500 to Sump's attention before the MSA being finalized. However, he conceded that he directed Sump not to obtain updated financial statements, because he did not want the divorce proceedings to be delayed. Thus, Eversman signed the MSA knowing about the discrepancy. We agree with Bruning that, given Eversman's knowing decision to sign the MSA rather than obtain updated financial documents, he has waived his right to pursue a claim against Bruning for failure to address the alleged error. See *In re Nitz*, 317 Ill. App. 3d 119, 130 (2000) (a party's conduct that is inconsistent with an intent to enforce a known right result in waiver of that right).

¶ 66        5. *Claim Regarding Eversman's Alleged Payment of Laura's Attorney Fees*

¶ 67    Eversman alleged in his complaint that Bruning "required and pressured" him into paying Laura's attorney fees. The trial court found that this allegation was directly contradicted by the MSA, which provided for the equalization of attorney fees from marital funds, and that Eversman failed to present any evidence to the contrary.

¶ 68    Eversman has forfeited any argument on this issue by failing to address it in either his initial brief or his reply brief. See Ill. S. Ct. R. 341(h)(7) ("Points not argued are forfeited and shall

not be raised in the reply brief, in oral argument, or on petition for rehearing.") Accordingly, we do not address it.

¶ 69        6. *Claim Regarding the Failure to Include the Rent Provision in the MSA*

¶ 70    Eversman argued in his response to Bruning's motion for summary judgment that Bruning was also negligent in failing to include a provision in the MSA, which Eversman requested, requiring Laura to pay him two months' rent. (The MSA provided that Laura was permitted to reside in the marital residence, which was awarded to Eversman, for up to two months after the dissolution.)

¶ 71    This issue is not properly before us. As was said in another context:

"[A] response to a motion for summary judgment is not the proper vehicle to assert new factual allegations that should have been included in the underlying complaint. 'When ruling on a motion for summary judgment, the trial court looks to the pleadings to determine the issues in controversy. [Citation.] If a plaintiff desires to place issues in controversy that were not named in the complaint, the proper course of action is to move to amend the complaint. [Citation.]' [Citation.] Clearly, the trial court could not deny summary judgment upon unpleaded theories of legal malpractice that were raised, for the first time, in opposition to the motion for summary judgment. Thus, we reject plaintiff's suggestion that he raised issues of fact precluding summary judgment." *Abramson v. Marderosian*, 2018 IL App (1st) 180081, ¶ 55.

Accordingly, because Eversman failed to include his rent allegation in his counterclaim, we do not consider whether he raised a genuine issue of fact on the issue.

¶ 72    We note too that Eversman has forfeited any argument on this issue by failing to address it in either his initial brief or his reply brief. See Ill. S. Ct. R. 341(h)(7) ("Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing.")

¶ 73                                III. CONCLUSION

¶ 74    For the reasons stated, we affirm the judgment of the circuit court of McHenry County.

¶ 75    Affirmed.