2022 IL App (1st) 210814-U

SIXTH DIVISION
May 27, 2022

No. 1-21-0814

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE BOARD OF TRUSTEES OF THE UNIVERSITY OF ILLINOIS, | ) ) ) | |
| Plaintiff and Counter-Defendant-Appellant, | ) ) | Appeal from the Circuit Court of |
| v. | ) ) | Cook County. |
| PAUL SCHEWE, ERIN O'CALLAGHAN, VERONICA SHEPP, KATHERINE LORENZ, ANNE KIRKNER, SARAH MALONE, and MARLEE FRY, | ) ) ) ) | No. 19 CH 13902 Honorable Neil H. Cohen, |
| Defendants, | ) ) | Judge Presiding. |
| (Paul Schewe, Defendant and Counter-Plaintiff-Appellee). | ) ) | |

JUSTICE MIKVA delivered the judgment of the court.
Justices Harris and Oden Johnson concurred in the judgment.

**O R D E R**

¶ 1    *Held*:  Partial summary judgment that the employer had a duty to defend is affirmed where some of the conduct alleged in the underlying complaint potentially fell within the scope of the employer's self-insurance plan. The denial of summary judgment on the issue of the employer's duty to indemnify is affirmed where the issue was not ripe for adjudication.

¶ 2    The Board of Trustees of the University of Illinois (Board) brought a declaratory judgment action seeking a finding that it owed no duty to defend or indemnify claims against its employee, Paul Schewe, whose alleged behavior is the subject of a federal civil rights complaint filed by six current or former graduate students at the University of Illinois Chicago (UIC). The students allege that Mr. Schewe, while employed as a professor at UIC, engaged in a range of sexual misconduct and harassment.

¶ 3    In its complaint for declaratory judgment, the Board asserted that the University of Illinois liability self-insurance plan (Plan) does not provide coverage for Mr. Schewe for any of the claims raised by the graduate students in the underlying litigation. The parties filed cross-motions for full or partial summary judgment in the declaratory action: the Board argued that it owed no duty to defend or to indemnify Mr. Schewe; Mr. Schewe argued that the Board owed him a duty to defend; and the students argued that the Board also owed a duty to indemnify Mr. Schewe.

¶ 4    The circuit court granted partial summary judgment in favor of Mr. Schewe and against the Board on the issue of the Board's duty to defend him. The circuit court denied summary judgment to the Board, and to the six students, on the issue of the Board's duty to indemnify, explaining that because there was not yet a judgment against Mr. Schewe in the underlying federal litigation, the issue of indemnification was not yet ripe for adjudication. The circuit court entered an order pursuant to Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016), finding no just reason to delay enforcement or appeal of these rulings.

¶ 5    The Board now appeals the circuit court's summary judgment rulings, reasserting its argument that the conduct alleged in the underlying litigation excludes Mr. Schewe from coverage under the Plan. For the following reasons, we affirm.

¶ 6                                    I. BACKGROUND

¶ 7     This appeal involves a dispute between the Board and Mr. Schewe over whether the Board, pursuant to its obligations to UIC employees under the Plan, has a duty to defend Mr. Schewe in a federal civil rights action filed by six current or former graduate students who sued Mr. Schewe for misconduct and sexual harassment.

¶ 8                                    A. The Plan

¶ 9     The Board maintains a liability self-insurance plan for the University of Illinois (Plan) under which,

> "[t]he Employer, based on the provisions of the Plan and subject to its limitations, will pay on behalf of the Covered Person all Damages to which the Plan applies, which the Covered Person shall become legally obligated to pay for a Claim first made while the Plan is in effect: (1) because of Injury or Personal Injury caused by an Occurrence; or (2) because of injury or Personal Injury arising out of the rendering of or failure to render University Service."

¶ 10    A number of the definitions set out in article I of the Plan are relevant. "Claimant" is defined as "any person, organization, corporation or unit of government making Claim against a Covered Person on a cause of action which resulted from an Occurrence or arose out of the rendering of or failure to render University Service."

¶ 11    "Covered Person" is defined as "any person or organization designated in the Covered Persons provisions of the Plan." Those provisions, found in article III, specify that "Covered Person[s]" include "the Employer," "Officers and Members of the Board of Trustees," "Employees," "Agents," and "Contracting Parties (but only as specified by written agreement with the University)."

¶ 12     "Damages" is defined as "any monetary consideration approved under the Plan for payment to a Claimant or the amount of a final judgment awarded to a Claimant by a court of competent jurisdiction, including but not limited to money, services, and waiver of amounts payable from patients and others who receive University services, but excluding payments of back pay for service rendered, fines, monetary penalties, costs of cleaning up contaminated sites, and payments which are contrary to public policy."

¶ 13     "Employee" is defined as "a person, who at the time of an Occurrence, or the rendering of or failure to render University Service, was employed by Employer and acting within the scope of his or her University duties."

¶ 14     "University Service" is defined as "a service, or series of related services (including health care), performed directly for a person or organization by the University or by a member of the Board, Officer of the Board, Employee, or Agent of the University, while acting within the scope of his or her University duties."

¶ 15     "Occurrence" is defined as "any incident or accident while the Plan is in effect, including continuous or repeated exposure to conditions, which results in an Injury or Personal Injury not expected or intended from the standpoint of the Covered Person."

¶ 16     "Injury" is defined as "physical damage to or destruction of tangible property, bodily or mental injury, sickness or disease, including death, to which the Plan applies and resulted from an Occurrence in the conduct of University business. The term Injury shall not be deemed to mean intentional torts."

¶ 17     Finally, "Personal Injury" is defined as

"Damages to which the Plan applies sustained by any person or organization and arising out of one or more of the following committed in conduct of University business:

***

D. sexual harassment, humiliations, or discrimination

***

K. violation of a civil or constitutional right."

¶ 18                          B. Allegations in the Underlying Suit

¶ 19    On September 19, 2019, Erin O'Callaghan, Veronica Shepp, Katherine Lorenz, Anne Kirkner, Sarah Malone, and Marlee Fry (collectively, the students)—all current or former graduate students at UIC—filed suit in the United States District Court for the Northern District of Illinois against Paul Schewe, the Board, UIC, and two Title IX administrators employed by UIC. They alleged in their complaint that Mr. Schewe, then a tenured professor of criminology at UIC, had subjected them to various acts of sexual misconduct ranging from inappropriate remarks to, in the case of one of the students, an incident of sexual assault. All of the students alleged that they felt "constantly pressured to interact and socialize with Defendant Schewe in unsafe environments (such as his apartment and his boat) where alcohol and/or drugs [were] present." They further alleged that they feared they would suffer adverse professional consequences if they refused to socialize with him. In addition to these more general descriptions of a hostile work environment, the students alleged the following specific instances of misconduct.

¶ 20                          1. Anne Kirkner and Katherine Lorenz

¶ 21    Ms. Kirkner and Ms. Lorenz alleged that on September 7, 2016, when they were both his students, they accepted an email invitation from Mr. Schewe to socialize on his boat. Although they had declined similar invitations in the past, they relented and decided to attend, feeling "they would face negative repercussions in their academic program if they continued to decline [his] constant and persistent invitations." Ms. Kirkner and Ms. Lorenz allege that during the gathering,

Mr. Schewe regaled them with inappropriate stories about previous parties on his boat involving alcohol and illicit drugs and that Mr. Schewe offered them cocaine, which they declined.

¶ 22    Ms. Lorenz further alleged that in December 2016, at an end-of-semester party, Mr. Schewe, "who was clearly too intoxicated to drive a motor vehicle," offered to drive her home from the event. She further alleged that during the 2017 fall semester, Mr. Schewe texted her images of "naked, or almost naked, women," apparently taken on his boat. Ms. Lorenz further alleged that later that same semester, she walked into Mr. Schewe's office for a meeting and, within clear view of her, he "had naked pictures of a woman open on his desktop computer monitor" which "did not appear to be work or research related." She further alleged that at her dissertation defense party in September 2017, which several of Mr. Schewe's students attended, Mr. Schewe commented to her partner, "there are so many women here I want to f***."

¶ 23                              2. Marlee Fry

¶ 24    Ms. Fry alleged that on September 7, 2016, she received an email invitation from Mr. Schewe to attend a "wine and cheese" event on his boat the following day. The purported purpose of this gathering was for Ms. Fry, who at the time was one of Mr. Schewe's new graduate students, to meet two of her peers who were in the same program whom she had not had a chance to meet at orientation. She alleged that when she arrived at Mr. Schewe's boat, he greeted her by saying "wow, you look great." Already on the boat were two of Mr. Schewe's friends who were not associated with UIC and who Ms. Fry alleges were visibly intoxicated. When one of Ms. Fry's female peers arrived, the men commented on the new arrival's physical appearance and expressed how sexually desirable they found her. Later, one of Mr. Schewe's friends placed his finger through a hole in Ms. Fry's jeans and laughed. Ms. Fry alleged that at no point did Mr. Schewe intervene to rein in the behavior of his friends and, when more of his friends began to arrive, she

felt unsafe and decided to leave.

¶ 25    Ms. Fry returned to Mr. Schewe's boat later that semester when Mr. Schewe decided to hold class there one day. Although she felt uncomfortable due to her previous experience on the boat, she "felt compelled to attend as the other students were going and it was part of the class." During this off-campus class session, Ms. Fry alleges that "[Mr.] Schewe failed to seriously teach class." Instead of discussing the reading assignment and class materials as planned, he "proceeded to tell informal stories about his life and expressed disappointment about how he and [his] students should not drink because it was technically class time."

¶ 26                              3. Sarah Malone

¶ 27    Ms. Malone alleged that she was invited to Mr. Schewe's boat on September 22, 2017. According to her, because of his "power over funding and other academic opportunities and because it was clear that [Mr.] Schewe favored students who socialized with him outside of professional and academic settings," she felt compelled to accept the invitation. At the event, Mr. Schewe invited her to come back the next night to meet a friend of his. When she returned the following evening, a party was taking place on the dock. She alleged that Mr. Schewe then introduced her to a male student, also in the graduate program, and in front of the male student uttered, "I only f*** my students after they've defended their dissertations." Ms. Malone alleged this comment made her feel uncomfortable and unsafe and she left shortly thereafter.

¶ 28                    4. Erin O'Callaghan and Veronica Shepp

¶ 29    Ms. O'Callaghan alleged that on November 2, 2017, during her first semester at graduate school, she and several peers, including Ms. Shepp, attended an informal happy hour hosted by Mr. Schewe and another graduate student. After drinking for several hours, the party thinned out and Mr. Schewe invited some of the remaining students back to his apartment. Ms. O'Callaghan

alleged that as soon as they entered the apartment, Mr. Schewe began pressuring everyone to continue consuming alcohol. He also allegedly offered them marijuana and edible marijuana products. Ms. Shepp alleged that Mr. Schewe "hover[ed] over her" until she agreed to consume marijuana, and Ms. O'Callaghan alleged that he began to make physical advances on her, which were witnessed by other attendees. Ms. O'Callaghan further alleged that her "intoxication, fear of causing a scene ***, and fear of the power disparity between them caused her to freeze when Defendant Schewe began touching her back." Eventually, she fell asleep on the couch, and the other students left to get something to eat. Ms. O'Callaghan alleges that once the other students were gone, Mr. Schewe assaulted her. She did not recall how she ended up in Mr. Schewe's bedroom, but she did recall that at one point, Mr. Schewe "entered the bedroom, laughed, rolled her over from her side onto her back, pulled her pants and underwear down, and performed oral sex on her, all without consent."

¶ 30    Ms. O'Callaghan alleged that after this incident, she relied on Ms. Kirkner and Ms. Shepp to accompany her when she had periodic grant meetings with Mr. Schewe. Their presence in the room "reduced [her] stress and anxiety to a level where she could get through these meetings." She further alleges that Mr. Schewe tended to go on tangents, and the presence of Ms. Kirkner and Ms. Shepp kept the meetings on track and allowed them "to be over as quick as possible."

¶ 31    The students further alleged that at one such meeting, Mr. Schewe said that he would party with R. Kelly if given the opportunity. The students allege that they found this comment disturbing because it was made "after [Mr.] Schewe had been consulted by an advocate for UIC's Women's Leadership and Resource Center regarding the group's #MuteRKelly campaign, designed to get [] UIC to cancel a planned R. Kelly concert following the revelations about his history of sexual assault of underage girls and young women that had been in the national spotlight." Ms.

O'Callaghan eventually filed a complaint with UIC administrators documenting her sexual assault allegation.

¶ 32    Based on these incidents of alleged misconduct, the six federal plaintiffs asserted claims against Mr. Schewe for sexual harassment, hostile environment, negligence, battery, intentional infliction of emotional distress, and gender violence.

¶ 33                     C. The Board's Declaratory Judgment Action

¶ 34    On October 23, 2019, Mr. Schewe requested representation under the Plan. On November 8, 2019, he received a response from UIC's risk management office, explaining that "[t]he University has analyzed the allegations asserted against you in the Complaint *** and has determined that the Plan does not provide coverage to you for any of the claims, causes of action or damages alleged." On December 2, 2019, the Board filed the declaratory judgment action that is the subject of this appeal.

¶ 35    In the operative amended complaint, filed on July 22, 2020, the Board sought a declaration that, based on the content of the allegations against him, it had no duty to defend or indemnify Mr. Schewe under the Plan. The Board argued that (1) Mr. Schewe was not a "Covered Person" as defined by the Plan, (2) the complaint alleged no "Occurrences," (3) no "Injury" occurred, and (4) the Plan provided no coverage for the defense of intentional or criminal acts.

¶ 36    On August 24, 2020, Mr. Schewe filed an answer and a counterclaim asserting that the Board breached the terms of the Plan by failing to defend him and seeking declarations that he was entitled to benefits under the Plan and that the Board was obligated to defend and indemnify him in the federal case. The Board answered Mr. Schewe's counterclaim on October 7, 2020. On November 30, 2020, all parties filed motions for summary judgment. The Board sought summary judgment on the basis that it owed no duty to defend or indemnify; Mr. Schewe sought partial

summary judgment, arguing that the Board did owe a duty to defend him; and the students argued that UIC also owed a duty to indemnify Mr. Schewe.

¶ 37                          D. The Circuit Court's Summary Judgment Rulings

¶ 38    On February 22, 2021, the circuit court granted Mr. Schewe's motion for partial summary judgment and denied the Board's and the students' respective motions. In response to the Board's argument that Mr. Schewe was not a "Covered Person" because he was acting outside his university duties when he committed the alleged misconduct, the court explained that while some of the conduct alleged in the complaint was plainly beyond the scope of Mr. Schewe's university duties, some clearly was not. The court mentioned specifically instances of sexual harassment that were alleged to have occurred during academic meetings with students. The court reasoned that "[c]onducting academic meetings is clearly within the scope of [Mr.] Schewe's duties as a professor" and "[u]nder Illinois law, if *any* allegations of the underlying complaint potentially fall with the policy, there is a duty to defend." (Emphasis in original.)

¶ 39    In response to the Board's argument that it had no duty to defend Mr. Schewe because the complaint against him alleged no "Occurrence" as that term is defined in the Plan, the court again referred to incidents that allegedly took place at academic meetings. As the court explained,

> "The [Plan] defines an 'occurrence' as an 'incident or accident' resulting in injury 'not expected or intended from the standpoint of the Covered Person.' The Underlying Complaint's allegations of Schewe's acts of sexual harassment at academic meetings allege 'incidents' resulting in injury to Students that were potentially not expected or intended from Schewe's standpoint.
>
> To the extent the Board is asserting that all injuries stemming from sexual harassment must be expected or intended by the harasser, this is contrary to the plain and

unambiguous language of the [Plan] which *expressly* covers personal injury arising out of sexual harassment." (Emphasis in original.)

¶ 40    The court likewise rejected the Board's remaining arguments that it had no duty to defend Mr. Schewe because all his alleged acts of misconduct were either intentional torts or criminal in nature. Once again, the court noted that "while some of the allegations of the Underlying Complaint clearly allege intentional and/or criminal conduct, the instances of sexual harassment during academic meetings do not." Citing *Indiana Insurance Co. v. Powerscreen of Chicago, Ltd.*, 2012 IL App (1st) 103667, ¶ 27, the court reiterated that "an insurer has a duty to defend if *any* allegations *potentially* fall within the policy regardless of the presence of allegations that clearly do not fall within the policy." (Emphases in original.) Because the complaint "allege[d] facts potentially within the coverage of the Self-Insurance Plan," the court concluded that the Board had a duty to defend Mr. Schewe and granted his motion for partial summary judgment on this issue.

¶ 41    On the separate issue of the Board's duty to indemnify, the court denied summary judgment to both the Board and the students, explaining that absent a judgment against Mr. Schewe in the underlying federal case, it was premature to rule on the issue of indemnification, as that question was not yet ripe for adjudication.

¶ 42    On June 11, 2021, the circuit court issued an order, pursuant to Rule 304(a) (eff. Mar. 8, 2016), finding that there was no just reason for delaying the enforcement or appeal of its February 22, 2021, summary judgment rulings. This appeal followed.

¶ 43                                    II. JURISDICTION

¶ 44    The circuit court made its finding that there was no just reason for delaying the enforcement or appeal of its summary judgment rulings on June 11, 2021, and the Board timely filed a notice of appeal on July 12, 2021. We have jurisdiction over this appeal pursuant to Illinois Supreme

Court Rule 304(a) (eff. Mar. 8, 2016), governing appeals from final judgments as to one or more but fewer than all the parties' claims.

¶ 45                                    III. ANALYSIS

¶ 46     On appeal, the Board argues the circuit court erred in granting partial summary judgment to Mr. Schewe on the issue of the Board's duty to defend him. The Board's position is that the allegations in the underlying suit do not trigger its duty to defend for three reasons: (1) none of the conduct alleged occurred within the scope of Mr. Schewe's university duties, (2) the allegations do not describe an "Occurrence" entitling Mr. Schewe to coverage under the Plan because the harm he allegedly caused was "expected or intended from the standpoint of the Covered Person," and (3) the complaint alleged only intentional conduct and intentional torts, which are expressly excluded from coverage under the Plan.

¶ 47     Echoing the reasoning of the circuit court, Mr. Schewe argues in response that while some of the conduct alleged in the complaint was plainly outside the scope of his employment duties or involved intentional conduct, not all the students' allegations fit into these excluded categories. Specifically, Mr. Schewe identifies five allegations which he contends "involve actions within the scope of [his] employment, which do not allege intentional torts, criminal acts, or injuries he should have expected."

¶ 48     These five allegations include (1) holding a class on his boat during the fall of 2016, (2) having an image of a naked woman displayed on his desktop computer with no apparent academic purpose during an on-campus meeting with Ms. Lorenz, (3) stating during an on-campus meeting with Ms. O'Callaghan, Ms. Kirkner, and Ms. Schepp that he would party with R. Kelly if given the opportunity, (4) using his institutional power as the director of graduate studies to favor students who socialized with him, and (5) inviting Ms. Fry to his boat for the purported purpose

of meeting two other graduate students, making inappropriate comments to her, and not intervening when his friends made her feel uncomfortable. Mr. Schewe claims that these five allegations are a sufficient basis for the Board's duty to defend him, and he asserts that the Board simply ignores these claims, focusing instead on those allegations in the complaint that do not trigger coverage.

¶ 49    On the separate issue of indemnification, the Board asserts that because it owes no duty to defend Mr. Schewe, it necessarily owes no duty to indemnify him either. Mr. Schewe argues in response that the question of whether an insurer has a duty to indemnify cannot be resolved until liability has been incurred in the underlying litigation. As that has not yet happened in this case, the circuit court correctly denied summary judgment to the Board on this issue.

¶ 50    Summary judgment is proper when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2020). "The construction of an insurance policy and a determination of the rights and obligations thereunder are questions of law for the court which are appropriate subjects for disposition by way of summary judgment." *Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 156 Ill. 2d 384, 391 (1993). We review the circuit court's rulings on summary judgment *de novo*. *Williams v. Manchester*, 228 Ill. 2d 404, 417 (2008).

¶ 51                              A. The Board's Duty to Defend

¶ 52    As a general matter, the duty to defend is "much broader" than the duty to indemnify. *Indiana Insurance Co. v. Powerscreen of Chicago, Ltd.*, 2012 IL App (1st) 103667, ¶ 27. In determining whether the Board has a duty to defend Mr. Schewe, we must "compare the allegations of the underlying complaint to the policy language." *Outboard Marine Corp. v. Liberty Mutual*

*Insurance Co.*, 154 Ill. 2d 90, 125 (1992). In doing so, the allegations in the underlying complaint "must be liberally construed in favor of the insured." *Id.* If the facts alleged "fall within *or even potentially within* the policy's coverage, the insurer's duty to defend arises." (Emphasis in original.) *La Grange Memorial Hospital v. St. Paul Insurance Co.*, 317 Ill. App. 3d 863, 869 (2000). Additionally, "if several theories of recovery are alleged ***, the insurer's duty to defend arises even if only one of [those] theories is within the potential coverage of the policy." *General Agents Insurance Company of America, Inc. v. Midwest Sporting Goods Co.*, 215 Ill. 2d 146, 155 (2005). The question for this court, then, is whether any of the claims in the lawsuit against Mr. Schewe even potentially fell within the Plan's coverage.

¶ 53                              1. Mr. Schewe's University Duties

¶ 54    The Board first contends that it owes no duty to defend because Mr. Schewe does not qualify as an "Employee" or "Covered Person" as those terms are defined in the Plan (see *supra* ¶¶ 10, 12), as he was not acting within the scope of his university duties when any of the misconduct alleged in the complaint took place. As the Board puts it, "[n]one of the conduct alleged in the General Allegations of the First Amended Complaint in the Underlying Lawsuit is remotely of a kind a professor is employed to perform." Further, "most of the conduct occurred on a boat, on a dock, at a party or in an apartment, far beyond any authorized time or University space ***[a]nd, the misconduct alleged cannot reasonably be construed to be actuated by any purpose to serve the University."

¶ 55    There are several flaws in this analysis. First, as the circuit court acknowledged in its ruling, while much of the conduct alleged in the complaint occurred outside of "University space," *some* of the alleged misconduct did take place on campus or in a location that had been designated for academic purposes. The allegations involving the picture of a naked woman displayed on Mr.

Schewe's computer and the inappropriate comment about partying with R. Kelly both are alleged to have occurred in Mr. Schewe's office at UIC, during what were supposed to be academic meetings with students. Additionally, Ms. Fry alleged that Mr. Schewe held a class session on his boat, which she felt obligated to attend because "other students were going and it was part of the class." While there were no allegations of sexual harassment during this class, there were allegations that the class held on the boat contributed to Ms. Fry's injury because of her previous experience on the boat during which Mr. Schewe told her she looked great, his friends commented on her peer's physical appearance and expressed how sexually desirable they found her, and one of Mr. Schewe's friends placed his finger through a hole in Ms. Fry's jeans and laughed. The allegation that Mr. Schewe required students to come to class on his boat, where the students had previously experienced sexual harassment, is an allegation of conduct that clearly fell within Mr. Schewe's scope of employment. The fact that many of the allegations in the complaint are about conduct that took place off campus does not eliminate the Board's duty to defend.

¶ 56    A second flaw in the Board's analysis is that it relies on far too narrow a view of Mr. Schewe's duties. Mr. Schewe's duties extended beyond classroom teaching. Mr. Schewe stated in an affidavit he attached to his motion for partial summary judgment that during the relevant time frame, he was not only an associate professor of criminology, law and justice at UIC, but he was also the "Director of Graduate Studies." As such, according to the affidavit, his "additional duties included recruiting graduate students, heading the graduate admissions committee, serving as the academic advisor for all Masters students, assisting MA and graduate students in obtaining teaching assistantships, research assistantships, awards, fellowships, and post-graduate employment, administering comprehensive exams, and documenting outcomes of the MA and PhD programs." He also considered "fostering peer support within the program" to be one of his

responsibilities, and, to that end, he "regularly helped new and existing Masters and PhD students meet, and develop relationships with, other students and mentors to help them build robust support networks."

¶ 57    Mr. Schewe's description of these additional duties as director of graduate studies aligns with the general allegations in the complaint, where the students alleged that they "all relied on [Mr.] Schewe for funding and access to professional opportunities" and for "networking and letters of recommendations." The specific allegations in the complaint also intersect with Mr. Schewe's outside-the-classroom responsibilities. For example, Ms. Fry alleges she chose to attend the "wine and cheese" event on Mr. Schewe's boat, where she claims she was harassed, because Mr. Schewe presented the event as an opportunity to meet two of her graduate student peers with whom she would be working. In another incident described in the complaint, Mr. Schewe allegedly made inappropriate comments during Ms. Lorenz's dissertation defense party. At events like these, Mr. Schewe was engaging in the alleged conduct within the scope of his role as director of graduate studies. Because these allegations at least potentially fall within the Plan's coverage, and because that is all that is required to trigger a duty to defend, we reject the Board's argument that there was no duty to defend because none of the allegations involve conduct that was within the scope of Mr. Schewe's duties.

¶ 58                         2. The Meaning of an "Occurrence"

¶ 59    The Board next contends that "[t]he allegations of the Underlying Lawsuit, even when considered in the light most favorable to Schewe, all allege conduct that was expected or intended by Schewe to cause the injury complained of, including sexual harassment." Accordingly, the Board concludes, it owes no duty to defend Mr. Schewe because the complaint does not allege an "Occurrence" as that term is defined under the Plan, which is limited to an incident that results in

an injury that is "not expected or intended" from the standpoint of Mr. Schewe. We disagree.

¶ 60    Our courts have "cautioned against deciding the ultimate fact of the insured's intent in an underlying lawsuit during a declaratory-judgment action over the duty to defend that lawsuit." *Country Mutual Insurance Co. v. Dahms*, 2016 IL App (1st) 141392, ¶ 46 (citing *Pekin Insurance Co. v. Wilson¸* 237 Ill. 2d 446, 467 (2010); *Maryland Casualty Co. v. Peppers*, 64 Ill. 2d 187, 197 (1976)). As we explained in *Dahms*, only in "rare case[s]" is the conduct alleged in an underlying complaint so obviously intentional in nature that we should find that the allegations "could not even potentially fall within the coverage of a policy." *Id.* ¶ 47. In our view, this is not that "rare case."

¶ 61    Here, at least for the five allegations highlighted by Mr. Schewe and discussed in the preceding section, it is certainly not a foregone conclusion that Mr. Schewe intended to injure his students with his words or his actions. To the contrary, the question of Mr. Schewe's intent remains to be resolved, giving rise to a duty to defend.

¶ 62                                3. Intentional Torts

¶ 63    The Board's final argument is that it owes no duty to defend because all of Mr. Schewe's alleged misconduct was either "an intentional tort" or "was caused intentionally." This argument is a variation of the Board's second argument, and we reject it for the same reasons. Where the allegations do not "conclusively establish" an intentional tort, those allegations give rise to a duty to defend. *Id.* ¶ 56. Here, at least with respect to the five allegations highlighted by Mr. Schewe as triggering coverage, it remains unclear whether Mr. Schewe engaged in an intentional tort.

¶ 64    For the reasons discussed above, we find that some of the allegations in the complaint give rise to the duty to defend. We therefore affirm the ruling of the circuit court and find that the Board has a duty to defend Mr. Schewe in the underlying lawsuit.

¶ 65                                  B. The Duty to Indemnify

¶ 66     We also affirm the circuit court's ruling denying the Board, and the students, summary judgment on the issue of the Board's duty to indemnify Mr. Schewe. While an insurer's duty to indemnify is narrower than its duty to defend, "the question of whether the insurer has a duty to indemnify the insured for a particular liability is only ripe for consideration if the insured has already incurred liability in the underlying claim against it." *Outboard Marine Corp.*, 154 Ill. 2d at 128. That has not yet happened in this case. Accordingly, the circuit court was correct to deny summary judgment on the issue of indemnification at this time.

¶ 67                                     IV. CONCLUSION

¶ 68     For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 69     Affirmed.